# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

HENRY CURTIS JACKSON, JR.                                    PETITIONER

vs.                                         Civil Action No.: 4:03CV461-P

CHRISTOPHER EPPS, et. al.                                    RESPONDENTS

## MEMORANDUM OPINION AND ORDER

Henry Curtis Jackson, Jr., an inmate confined to the Mississippi Department of Corrections, files application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the otherwise final capital murder convictions and four sentences of death imposed on him by the Circuit Court of Leflore County, Mississippi. Having considered the alleged circumstances, the cited authorities, and the record in this matter, the Court denies the application for the reasons set forth herein.

### Background and Procedural History

Around 7:00 p.m. on November 1, 1990, Martha Jackson and four of her grandchildren left her home in the Rising Sun community, south of Greenwood, Mississippi, to attend church services. Her daughter, Regina Jackson, stayed home with her two daughters, Dominique, age five, and Shunterica, age two. Four of Regina's nieces and nephews also stayed home from church services that evening. Eleven year old Sarah, three year old Antonio, two year old Andrew, and one year old Andrea, were watching *The Cosby Show* on television with Regina and her children when Regina's brother, the petitioner in this cause, knocked on the door. Regina let Petitioner into the house, and he asked her to give him a cigarette and to mix him a remedy for an upset stomach. Shortly thereafter, Petitioner asked Regina why the telephone was not working, and she discovered that the telephone line was dead. Regina and Antonio left and were on their way to a neighbor's home to

1

report the telephone problem, but Sarah called Regina back to the home upon Petitioner's request. When Regina returned to the home, Petitioner asked her if the children could talk. When Regina told him that they could, he told her to take them into Martha's bedroom, which she did. After some discussion about what Regina did with money from her check, she stated that Petitioner grabbed her from behind and told her that "he wanted twenty dollars for some ass." (Trial Tr. Vol. 6, 563).[1] When Regina told him that she did not have the money, he stabbed her with a knife. Hearing Regina's calls for help, Sarah jumped onto Petitioner's back. Regina stated that she began pleading with Petitioner not to kill them as all three struggled, and that Petitioner told her "I love you but I have got to kill you." (Trial Tr. Vol. 6, 566).

By all accounts, Petitioner was at the home that evening in order to get money from a safe that Martha kept in her closet. The safe actually belonged to Eddie Self, Martha's son. According to Regina, only Tara, Self's daughter, and Martha knew the combination to the safe. Regina testified at trial that Sarah told him to get the safe and leave, but that Petitioner said "he came to kill us that Thursday and didn't kill us and he came to kill us that Saturday and he didn't kill us and he said he was going to kill all of us tonight." (Trial Tr. Vol. 6, 567). Petitioner took Regina and Sarah into Tara's bedroom in order to get the combination to the safe, and he began stabbing Sarah in the neck. He then took them into another bedroom and began to tie them up when Regina began striking him with some iron rods that were in the bedroom. She stopped trying to hit him when he picked up

---

[1] The State court record in this case comprises 18 volumes. There are eleven sequentially numbered volumes in the record. The first three volumes contain State court papers ["SCP Vol. __", the following seven volumes contain the transcript of trial proceedings ["Trial Tr. Vol. __, __"], and the final sequentially numbered volume is the trial judge's report to the Mississippi Supreme Court.

Andrea, the baby, and began to use her as a shield. Regina let Petitioner tie her up, and he stabbed her again in the neck. Petitioner also stabbed Antonio and Shunterica. Regina stated that she began to go in and out of consciousness, but she remembered hearing Petitioner dragging the safe down the hallway. The noise woke Dominique, who began calling for Regina. Regina testified that Petitioner called Dominique to him, told her that he loved her, then stabbed her and tossed her body to the floor. Petitioner returned to Regina, stabbing her in the neck and twisting the knife, at which point she pretended to be dead until she heard him leave.

Petitioner had tied Sarah's hands behind her back. Sarah testified that Petitioner stabbed her in the neck with a pocket knife, and that when the knife broke off in her neck, he retrieved a steak knife from the kitchen and continued stabbing her. She testified that she pretended to be dead, and that she ran out of the house while Petitioner was, ostensibly, stabbing Antonio. She said that she hid behind a tree, and she ran to her cousin when she saw him drive up to a neighbor's house. The police were called after Sarah was taken into the home and told everyone what had happened. Regina and Sarah both identified Petitioner as the person who had committed the crimes.

Members of the Leflore County Sheriff's Department responded to Martha Jackson's home, where they discovered Regina and the children. Sarah underwent surgery for five stab wounds across her abdomen, chest, and neck. Regina underwent surgery to repair five stab wounds in her neck, one of which almost completely severed the jugular vein on the right side of her neck. Andrea, the youngest child involved in the attacks, suffered one stab wound to the neck that resulted in tracheal and spinal cord injury. She cannot walk and has no fine motor control in her arms as a result.

Dominique, Shunterica, Antonio, and Andrew were pronounced dead at the scene. The

pathologist testified to the numerous lethal and non-lethal injuries inflicted upon the children. Shunterica suffered three stab wounds to the neck, two of which were lethal. Her right jugular vein was severed, and her spinal cord was torn. Andrew suffered three lethal wounds to the neck, and the force severed his carotid artery, jugular vein, and spinal cord. Dominique suffered four stab wounds to the neck, three of which were lethal. Her left jugular vein and trachea were cut through. Antonio suffered four stab wounds, two of which were lethal. Antonio was stabbed through the heart, and his trachea was cut.

Also on November 1, 1990, Eupora Police Officers had set up a roadblock and were conducting a license check when they received a report that there was a wrecked 1977 green Monte Carlo approximately fifty yards away from the roadblock. They discovered that the tag on the vehicle was registered to Martha Jackson's 1973 station wagon, while the car was registered to Petitioner. After receiving a call approximately thirty minutes later that police were searching for Henry Curtis Jackson, Jr., a Eupora Police officer returned to the car and retrieved the wallet on the console. Petitioner's identification was inside, and a massive manhunt for Petitioner began. Petitioner eluded the search teams by traveling through the woods and eventually jumping a train from Eupora to West Point. On Monday, November 5, 1990, he turned himself in at the West Point Police Department and was placed under arrest. He was read his rights, executed a waiver of rights, and gave a statement. After Leflore County Sheriff Ricky Banks arrived, Petitioner signed a written waiver of his rights and gave an audiotaped statement concerning the events that took place on November 1, 1990. In his statement, which was admitted at trial, Petitioner said that he went to his mother's house to get the safe, and that he knew his mother would be at church services at the time. He said that he cut the telephone lines with a knife that he brought with him, and that he

unsuccessfully attempted to remove the safe from the house after he stabbed Regina and the children. He fled by climbing out of the bathroom window and running to his car, which was parked approximately two blocks away from the house.

Petitioner was indicted by the Circuit Court of Leflore County on four counts of capital murder while engaged in the commission of the crime of felonious child abuse, two counts of aggravated assault, and one count of armed robbery. He was charged with the capital murder of two year old Shunterica, five year old Dominique, three year old Antonio, and two year old Andrew. He was charged with the armed robbery and aggravated assault of Regina, and he was charged with the aggravated assault of Sarah. He pled not guilty on all seven counts of the indictment.

Trial was set in the Leflore County Circuit Court for August 26, 1991. During the course of voir dire, defense counsel Johnnie Walls sought and obtained a change of venue. Petitioner's trial began on September 9, 1991, in the Copiah County Circuit Court. Petitioner was convicted and sentenced to death on four counts of capital murder.[2] Petitioner's convictions and sentences were affirmed on direct appeal. *Jackson v. State*, 684 So.2d 1213 (Miss. 1996) ("*Jackson I*"), *cert. denied*, *Jackson v. Mississippi*, 520 U.S. 1215 (1997).[3] Petitioner's subsequent motion for post-conviction relief was denied. *See Jackson v. State*, 860 So.2d 653 (Miss. 2003) ("*Jackson II*"). Petitioner then filed the instant petition.

---

[2] Petitioner was also sentenced to thirty years' imprisonment on the armed robbery count and twenty years on each of the two counts of aggravated assault, with the sentences to run consecutively.

[3] Petitioner's attorney on direct appeal did not file a petition for rehearing, so the original opinion was published as *Jackson v. State*, 672 So.2d 468 (Miss. 1996). After new counsel was appointed, the Mississippi Supreme Court granted Petitioner's out-of-time petition for rehearing and substituted the original opinion with the one cited above.

## Applicable Standard

Federal habeas jurisdiction is limited to the question of whether a prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Concerned only with whether a prisoner's constitutional rights have been afforded, the district court is not a "forum[] in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Rather, the federal court applies a "highly deferential standard" in evaluating the judgment of a state court. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citation omitted). The limits of federal habeas review are codified in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Bell v. Cone*, 535 U.S. 685, 693 (2002). Pursuant to the AEDPA, habeas corpus relief cannot be granted in connection with any claim adjudicated on the merits in State court proceedings unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the presented evidence. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); and 28 U.S.C. § 2254(d)(1) & (2). The factual findings of the State court are presumed correct, and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d) have been held to have independent meanings. *See, e.g., Bell v. Cone*, 535 U.S. 685, 694 (2002); *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially

indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner. *See id.* at 407-08; *see also Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry that does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Williams*, 529 U.S. at 410-11; *Morrow v. Dretke*, 367 F.3d 309, 313 (5ᵗʰ Cir. 2004) (habeas relief merited where state decision both incorrect and objectively unreasonable).

A petitioner must exhaust his remedies in State court prior to seeking federal habeas relief. *See Martinez v. Johnson*, 255 F.3d 229, 238 (5ᵗʰ Cir. 2001); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5ᵗʰ Cir. 2001); 28 U.S.C. §2254(b)(1). A petitioner has exhausted his claim when he has fairly presented the claim for which he seeks relief to the highest court of the State. *See Morris v. Dretke*, 379 F.3d 199, 204 (5ᵗʰ Cir. 2004). A federal court may not grant federal habeas relief on an unexhausted claim, but relief may be denied on an unexhausted claim. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Mercadel v. Cain*, 179 F.3d 271, 276 (5ᵗʰ Cir. 1999).

Where a petitioner fails to exhaust his State remedies, but it is clear that the State court to which he would return to exhaust the claim would find the claim procedurally barred, the claim is procedurally defaulted for purposes of federal habeas corpus review. *See*, *e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Finley v. Johnson*, 243 F.3d 215, 220 (5ᵗʰ Cir. 2001);

*Sones v. Hargett*, 61 F.3d 410, 416 (5ᵗʰ Cir. 1995). Likewise barred from federal habeas review are claims that the State court held procedurally barred on review on the basis of independent and adequate State law grounds. *See, e.g., Coleman*, 501 U.S. at 729-30 ("The doctrine applies to bar federal habeas claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests upon independent and adequate state procedural grounds."); *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977). Where a State court holds a claim barred on independent and adequate State law grounds and reaches the merits of the claim in the alternative, the bar imposed by the State court is not vitiated. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Hughes v. Dretke*, 412 F.3d 582, 592-93 (5ᵗʰ Cir. 2005) (alternate holding on merits by state court did not preclude imposition of bar on federal habeas review for petitioner's failure to contemporaneously object on federal constitutional grounds in state court); *Thacker v. Dretke*, 396 F.3d 607, 614 (5ᵗʰ Cir. 2005) (procedural bar imposed for petitioner's failure to contemporaneously object and preserve claim for review not circumvented by State court's alternative holding that constitutional claim lacked merit).

In order to receive federal habeas review of procedurally defaulted claims, Petitioner must demonstrate "'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Coleman*, 501 U.S. at 749-50 (internal citations omitted). In order to demonstrate cause, a petitioner must show "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice may be demonstrated by showing that the errors "worked to [the petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Carrier*, 477 U.S. at 494 (internal quotations

omitted). If a petitioner is unable to demonstrate cause and prejudice, he may obtain review of his claim by demonstrating that the application of the procedural bar would result in a miscarriage of justice because he is actually innocent of the crime. *See House v. Bell*, 547 U.S. 518, 537-38 (2006). An allegation of actual innocence requires that a petitioner support his claim "with new, reliable evidence that was not presented at trial and show that it was more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Fairman v. Anderson*, 188 F.3d 635, 655 (5th Cir. 1999) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). In terms of the sentencing phase, "miscarriage of justice" also means that, but for constitutional error, no reasonable juror would have found Petitioner eligible for the death penalty under the applicable state law. *Sawyer v. Whitley*, 505 U.S. 335, 336 (1992).

Counsel's failure to preserve a claim in State court can constitute cause sufficient to overcome a procedural default. *See Coleman*, 501 U.S. at 753-54. However, a petitioner claiming ineffective assistance of counsel for the purpose of having the underlying substantive claim reviewed on its merits must ordinarily have presented the ineffective assistance of counsel claim independently in State court before it may be argued as cause to excuse a procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). A federal habeas petitioner's claim that he was denied the effective assistance of counsel at trial is generally measured by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, Petitioner must establish that (1) his trial counsel's performance was so deficient that it cannot be said that he was functioning as "counsel" within the meaning of the Sixth Amendment, and (2) the deficient performance prejudiced his defense. *See id.* at 687; s*ee also Boyle v. Johnson*, 93 F.3d 180, 187 (5th Cir. 1996) (ineffective assistance of counsel claims analyzed under

*Strickland* framework).  As claims of ineffective assistance of counsel involve mixed questions of law and fact, claims previously considered and rejected by the State court may be overturned only if  "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); *Strickland*, 466 U.S. at 698.

With the foregoing principles in mind, the Court considers each of the sixteen claims raised by Petitioner.[4]  Though individually considered, the claims have been consolidated and renumbered for the sake of convenience.

## I.  Felonious Child Abuse

Petitioner raises three separate claims that involve Mississippi's use and construction of felonious child abuse as a predicate felony for capital murder.

## A.  Lesser-Included Offense Instruction

Petitioner was found guilty of four counts of capital murder while engaged in the commission of child abuse and/or battery pursuant to Miss. Code Ann. § 97-3-19(2)(f).  That statute provides that "[t]he killing of a human being without the authority of law and by any means or in any manner shall be capital murder. . . [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felony."  Miss Code Ann. § 97-3-19(2)(f).  At trial, the court refused to instruct the jury on lesser-included offenses, and it

---

[4] The petition for writ of habeas corpus was filed in this case on December 18, 2003. The Court considers the claims as briefed.  This Opinion and Order extensively refers to the document filed in support of the petition as "Pet. Memo," even though it is not styled by Petitioner as a memorandum.  (*See* docket entry no. 30).

instructed the jury that it must convict Petitioner of capital murder if it was shown beyond a reasonable doubt that the killings took place in the course of felonious child abuse. (SCP Vol. 2, 373-76).

Petitioner argues that in *Butler v. State*, 608 So.2d 314 (Miss. 1992), the Mississippi Supreme Court recognized that the felony murder statute and the capital murder statute, as it pertains to felonious child abuse, are essentially identical. *See id.* at 320. Butler, whose child ultimately died after she punched him in the abdomen to stop him from crying, was convicted under Mississippi's capital murder statute. *See id.* The Mississippi Supreme Court determined that Butler was entitled to a manslaughter instruction. Petitioner maintains that he was entitled to a jury instruction on manslaughter under *Butler*, as well as an instruction that explained to the jury that it had to find that he intended to commit child abuse in order to find him guilty of felony child abuse. Additionally, he argues that the overlap in the felony murder statute and the capital murder statute as it addresses child abuse gives the jury unfettered discretion to impose a sentence of death or a sentence of manslaughter, which violates the Eighth and Fourteenth Amendments.

The Mississippi Supreme Court rejected this claim when it was presented on direct appeal. The court found that evidence of Petitioner's intent precluded a finding that a manslaughter instruction was warranted, and it determined that there was no evidence to support a determination that any of the children were killed in the heat of passion. *Jackson I*, 684 So.2d 1213, 1227-28 (1996). It also found that the overlap between the felonious child abuse provisions in the capital murder statute and the felony manslaughter statute did not violate the Eighth Amendment or give prosecutors and juries unfettered discretion as to which sentence to impose, as a conviction for capital murder does not automatically result in a sentence of death. *See id.* at 1228-29. This claim

was again presented on post-conviction review, and the court held it barred by res judicata. *Jackson II*, 860 So.2d at 663. Petitioner argued that the bar was excepted by *Kolberg v. State*, 704 So.2d 1307 (Miss. 1997), but the court determined it was not an intervening decision. *See id.*

At the time of Petitioner's trial, abuse to a child that resulted in the child's death could be punished as either capital murder or manslaughter, depending upon the circumstances of the offense. The felony manslaughter statute provides that a murder committed without malice during the commission of any felony, beyond those specifically enumerated in the statute, is manslaughter. *See* Miss. Code Ann. § 97-3-27. At the time of Petitioner's trial, the felonious abuse of a child was not one of the excepted felonies. The capital murder statute provides that a murder that occurs during the course of an act of felonious child abuse is capital murder. However, harm must be intentionally inflicted in order for an act to constitute felonious child abuse. *See* Miss. Code Ann. § 97-5-39(2) (statute providing that "[a]ny person who shall intentionally (a) burn any child, (b) torture any child or (c) except in self-defense or in order to prevent bodily harm to a third party, whip, strike, or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse and/or battery of a child. . .."). Unlike the case in *Butler*, where there was no evidence that the mother attempted to kill the child or intended that the child die, there is no evidence that Petitioner killed any of the four children without an intent or attempt to do so. *See, e.g., Butler*, 608 So.2d at 320. The facts of Petitioner's case are more akin to the circumstances in *Walker v. State*, 671 So.2d 581, 598 (Miss. 1995), where the court found that no reasonable juror could find that Walker acted without malice where he strangled and drowned the victim. *Walker*, 671 So.2d at 598. Petitioner's jury heard testimony that Petitioner told his victims that he came with the intention of killing everyone in the house. Petitioner stabbed each of these children multiple

times in the neck, and he stabbed Antonio through the heart, as well. There is no evidence that would allow a reasonable juror to conclude that he did not intend to kill the children. *See id.* A criminal defendant is entitled to a lesser-included offense instruction only where the evidence would allow a rational jury to convict on the lesser charge and acquit on the greater. *See Hopper v. Evans*, 456 U.S. 605, 611-12 (1982); *Beck v. Alabama*, 447 U.S. 625, 639 (1980); *see also Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir. 1988), *overruled in part on other grounds as recognized by Vanderbilt v. Collins*, 994 F.2d 189, 195 (5th Cir. 1993) ( "In other words, due process and the Eighth Amendment require that, in a capital case, the jury must be allowed to consider a lesser included noncapital offense if the jury could rationally acquit on the capital crime and convict for the noncapital crime."). Petitioner has not demonstrated that it is unreasonable to conclude that he was not entitled to a manslaughter instruction under § 97-3-27 (felony manslaughter) or § 97-3-35 (heat of passion).

Moreover, the prosecutor and jury were not given "unfettered discretion to impose either the death penalty or convict of manslaughter" as suggested by Petitioner. First, the Court notes that "[s]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Additionally, Petitioner was not sentenced to death when the jury found him guilty of four counts of capital murder. Rather, the jury in this case returned verdicts of death after hearing evidence and receiving instructions on how to consider and weigh the evidence. Petitioner has not demonstrated that the decision to reject this claim was unreasonable within the meaning of the AEDPA, and it shall be dismissed.

**B.** *Edmund v. Florida*

In *Enmund v. Florida*, 458 U.S. 782 (1982), the United States Supreme Court held that the death penalty may be imposed only upon a defendant who kills, attempts to kill, intends to kill, or contemplates that lethal force will be employed in carrying out a felony. *Id.* at 796; *see also Tison v. Arizona*, 481 U.S. 137 (1987) (holding that major participation in the felony with reckless indifference to human life is an additional category that satisfies the culpability requirement). In order to satisfy the constitutional requirements as determined by the Court in *Enmund*, the Mississippi Legislature enacted Miss. Code Ann. § 99-19-101(7), which requires the jury to find at least one of the four *Enmund* factors before it can impose a sentence of death. On habeas review, Petitioner maintains that he is ineligible for the death penalty because the jury did not find that he intended the death of any of the victims, citing *West v. State*, 725 So.2d 872, 895 (Miss. 1998) in support. *See West*, 725 So.2d at 895 (Mississippi Supreme Court holding that "the jury cannot return a death sentence at all if it cannot conclude that a capital defendant intended the death of his victim."). Petitioner raised this claim on post-conviction review, and the Mississippi Supreme Court found it barred for Petitioner's failure to raise the issue at trial or on direct appeal. *See Jackson II*, 860 So.2d at 664. In the alternative, the court found Petitioner's claim without merit, as the jury found that Petitioner actually killed and attempted to kill his victims, which was sufficient to satisfy the culpability requirements under state law and Supreme Court precedent. *See id.*

This issue is barred from this Court's consideration pursuant to an independent and adequate State law procedural ground. *See, e.g., Coleman*, 501 U.S. at 729-30; *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997) (recognizing that Mississippi Supreme Court regularly and strictly applies the bar). Petitioner has not demonstrated the requisite cause and prejudice to overcome the bar, or

that a fundamental miscarriage of justice would result from this Court's failure to consider the claim.

Even if the Court were to find that Petitioner's claim is cognizable, he fails to demonstrate an entitlement to relief. Petitioner has not demonstrated that an *Enmund/Tison* analysis is applicable where the capital murder defendant is the actual killer. *See, e.g., Murray v. Delo*, 34 F.3d 1367, 1376 (8th Cir. 1994) (holding that petitioner who actively participated in the circumstances of the death could not successfully raise *Enmund* and *Tison* claim, as those are felony murder cases that apply in situations in which the defendant was not the shooter); *Workman v. Mullin*, 342 F.3d 1100 (10th Cir. 2003) (*Enmund/Tison* analysis is not required under the Eighth Amendment in a child abuse murder conviction where the defendant actually killed his victim). Even where such an analysis is required, the jury need only find the presence of one culpability factor in order for the death penalty to be imposed, and Petitioner's jury specifically found the presence of two factors. This claim is barred and otherwise does not entitle Petitioner to relief.

## C. Felonious Abuse/Battery of a Child

Petitioner argues that Mississippi's capital murder provision for child abuse/battery, as well as the death penalty scheme as a whole, fails to properly narrow the class of death-eligible defendants as required by the Eighth Amendment. He argues that Mississippi allows a criminal defendant to be death-eligible without any proof of intent to kill or commit the underlying felony, such that death-eligibility is rendered even if one accidentally or negligently kills a child during the commission of a felony. He also argues that only eight states authorize the death penalty for felony-murder *simpliciter*, and that only Florida joins Mississippi in making felonious child abuse the basis

for capital murder.[5]  He maintains that a form of capital murder that exists, at most, in only one other state offends the "evolving standards of decency" in this country.  *See, e.g., Kennedy v. Louisiana*, 128 S.Ct. 2461 (2008).

The Mississippi Supreme Court held this claim barred when it was presented on post-conviction review, as Petitioner failed to raise it at trial or on direct appeal.  *Jackson II*, 860 So.2d at 666.  It alternatively held that it had repeatedly found the State sentencing scheme constitutional, despite the lack of a deliberate design requirement in the capital murder statute.  *See id.,* citing *Miller v. State*, 748 So.2d 100, 103 (Miss. 1999).

This claim is barred from federal habeas review on an independent and adequate state law ground.  *See, e.g., Coleman*, 501 U.S. at 729-30; *Stokes*, 123 F.3d at 860.[6]  Petitioner has not demonstrated cause for the default or actual prejudice as a result.  Respondents argue, and this Court agrees, that Petitioner has never presented to a State court his argument that the legislative scheme offends the "evolving standards of decency," and it is likewise barred from habeas review.  *See, e.g., Ruiz v. Quarterman*, 460 F.3d 638, 642-43 (5th Cir. 2006) (holding that a petitioner who fails to present same "facts and legal theory" upon which current assertions has failed to properly exhaust his claim in state court and must show cause and prejudice or the miscarriage of justice exception to obtain review).

---

[5]  The Court notes that Petitioner argues that in Florida, an intentional or foreseeable injury to the child is required.  The Court also notes that Petitioner cites no authority for his claim that only eight states authorize the death penalty for felony murder *simpliciter*, but the Court notes that the Supreme Court found that to be the case when *Enmund* was decided in 1982.  *See Enmund*, 458 U.S. at 789.

[6] The Court notes that it is counsel's failure to raise the issue at trial or on direct appeal that bars this claim in federal habeas, and not the res judicata finding on post-conviction review.  *See Cone v. Bell*, 129 S.Ct. 1769 at 1781 (2009).

Even in the absence of a procedural bar, Petitioner fails to demonstrate that he is entitled to relief on this claim. The United States Supreme Court has held that a state's death penalty scheme "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). However, the Supreme Court has never required that a state define felony murder to include an intent element as to the killing. *See Hopkins v. Reeves*, 524 U.S. 88, 99-100 (1998) (noting that the lower court "read *Tison* and *Enmund* as essentially requiring the States to alter their definitions of felony murder to include a *mens rea* requirement with respect to the killing. In *Cabana v. Bullock*, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), however, we rejected precisely such a reading. . ."). Mississippi's capital murder statute expressly states that the jury cannot return a sentence of death unless it makes a determination that the defendant actually killed, attempted to kill, intended that a killing take place, or contemplated that lethal force would be employed. *See* Miss. Code Ann. § 99-19-101(7). Petitioner's jury found that he actually killed and attempted to kill his victims, which satisfies the requirement that the jury find that he had a culpable mental state before imposing a sentence of death pursuant to *Enmund* and *Tison*.

The Fifth Circuit recently noted that Mississippi "designates as murder (as opposed to capital murder) any homicide 'by any person engaged in the commission of any felony other than' certain enumerated felonies." *Crawford v. Epps*, 2009 WL 4324990 n.12 (5th Cir. Dec. 2, 2009) (citing Miss. Code Ann. § 97-3-19(1)(c)). Therefore, Mississippi law initially narrows its class of death-eligible defendants in its statutory definition of crimes. *See id.* At sentencing, the jury must find the presence of at least one aggravating circumstance beyond a reasonable doubt and the

presence of a culpability factor before a defendant is eligible for the death penalty.  *See* Miss. Code Ann. § 99-19-101.

This claim is barred, and Petitioner has not otherwise demonstrated that he is entitled to relief on this claim.  It shall be dismissed.

## II.  Mental Health Evaluation

### A.  Denial of Independent, Conflict-Free, Reliable, and Competent Evaluation

Petitioner argues that the trial court's appointment of Dr. Michael Whelan to conduct his mental health evaluation denied him an independent and neutral mental health evaluation as required pursuant to *Ake v. Oklahoma*, 470 U.S. 68 (1985).  He maintains that Dr. Whelan was his treating psychologist at the Mississippi State Penitentiary at Parchman, thereby rendering him ethically conflicted and unable to conduct the evaluation ordered by the court.  He also contends that Dr. Whelan failed to review records, failed to interview anyone during the course of the evaluation, and failed to complete essential neurological testing.  He also maintains that Dr. Timothy Summers, the expert the court allowed the defense to obtain, was unable to meaningfully assist the defense due to time constraints that prevented a full battery of neurological testing.  Petitioner notes that he has now been evaluated by both Dr. Criss Lott and Dr. Summers, and each concludes that he is brain damaged.  (*See* PCR Ex. 10, 25).[7]  Petitioner maintains that this evidence of brain damage would have influenced the jury, and that the State cannot carry its burden of proving that the trial court's failure to provide him with an independent, competent, and reliable evaluation was harmless beyond a reasonable doubt.

---

[7]  Throughout this opinion, the Court uses "PCR Ex. __" to refer to exhibits attached to the petition for post-conviction relief that was filed in State court.  Supplemental Exhibits were also filed, and they are noted as "Supp. PCR Ex. __" throughout the Opinion and Order.

Dr. Michael Whelan was a psychologist at the Mississippi Department of Corrections ("MDOC") who treated Petitioner for depression following his November 23, 1990 and March 8, 1991, suicide attempts. (*See* PCR Ex. 3, Greenwood-Leflore Hospital Records; PCR Ex. 4, Bolivar County Hospital records; *see also* PCR Ex. 5; Trial Tr. Vol. 9, 1076). While hearing motions in the case in April of 1991, Judge Evans stated he would enter an order appointing a psychiatrist and a psychologist to conduct a mental examination of Petitioner. (*See* Trial Tr. Vol. 4, 23-24).[8] Prior to entering an order selecting a psychiatrist and psychologist to conduct the evaluation, the trial court ordered the parties to inform it within four days of any special tests to be conducted, particular questions that needed to be answered, or areas that the doctors needed to explore. (*See* SCP Vol. 1). In June of 1991, the court appointed Dr. Whelan and Dr. Robert McKinley, a psychiatrist, to conduct an evaluation of Petitioner's competency and criminal responsibility, and each was ordered to also assess any possible mitigating circumstances. (*See, e.g.*, SCP Vol. 1). Their evaluations were to be joint and separate, and they were ordered to submit their reports to both the defense and the prosecution. (*See id.*; Trial Tr. Vol. 4, 24). Dr. Whelan and Dr. McKinley each examined Petitioner and opined that he was competent to stand trial and responsible for his actions at the time of the crimes. (*See* PCR Ex. 7 and Supp. PCR Ex. B).

Defense counsel Walls objected to the court's appointment of Dr. Whelan at a motion's

_____

[8] At a hearing on April 12, 1991, the State called up its motion for a mental examination to determine Petitioner's competency to stand trial, sanity at the time of the crimes, and his competency to be executed. (*See* Trial Tr. Vol. 4, 6-7). Walls noted that the court had already granted the defense's motion for an examination to assist the defense, and he objected that the State's examination was, therefore, unnecessary. (*See id.* at 7). After the State's objection to the appointment as being outside the purposes authorized by statute, the court rescinded the order granting the defense's motion and took the matter under advisement. (*See id.* at 7-14). The trial court later entered an order appointing Drs. Whelan and McKinley.

hearing on August 21, 1991, and he argued for an independent expert to be appointed to assist in the defense. (*See* Trial Tr. Vol. 4, 197-99). Walls specifically argued that Dr. Whelan was affiliated with MDOC, and that Petitioner needed the assistance of someone not affiliated with the State. (*See id.*). At some point after the hearing, but before the original trial date of August 26, 1991, the court authorized Walls to hire a psychologist, but Walls informed the court that he was unable to secure the assistance of an expert on such short notice. (*See, e.g.*, Trial Tr. Vol. 5, 244-45). On August 26, 1991, the court granted Walls' motion for a continuance and change of venue, and the trial was moved to Copiah County. (*See id.* at 398; Trial Tr. Vol. 6, 401-02). Trial began on Monday, September 9, 1991.

Walls obtained the services of Dr. Timothy Summers, on September 5, 1991, and Dr. Summers evaluated Petitioner two days later, which was a Saturday. (*See, e.g.,* Trial Tr. Vol. 7, 679-80). In the testimony he presented in mitigation at the sentencing phase of trial, Dr. Summers concluded that Petitioner likely suffers from a complex partial seizure disorder. (*See* Trial Tr. Vol. 9, 1195-96). Dr. Summers maintained that a full battery of neuropsychological testing, which he was unable to perform due to time constraints, would be required to confirm the presence or absence of the disorder. (*See id.*).

Prior to Dr. Summers' testimony, the defense presented the testimony of Dr. Whelan. (*See* Trial Tr. Vol. 9, 1074). Dr. Whelan testified that he did not complete a full battery of neuropsychological testing on Petitioner, as he believed that Petitioner was too depressed for the testing results to be valid. (*See id.* at 1077-78). Dr. Summers opined at trial that Dr. Whelan's reason for not completing the testing was "nonsense." (*See id.* at 1198-99).

On direct appeal, Petitioner argued that the trial court erred in denying his motion for a

continuance, which was made on the first day of trial, in order for him to obtain an independent psychiatric evaluation. *See Jackson I*, 684 So.2d at 1221. The Mississippi Supreme Court found that Petitioner waited until August to object to the June appointment of Drs. McKinley and Whelan, and that while Petitioner had no right to an expert of his choosing, the trial court granted his August request for the services of an expert. *See id.* It also found that as of August 26, 1991, Petitioner had not secured the evaluation or determined whether to pursue an insanity defense. *See id.* The court found that "[g]iven the five-month time frame in which Jackson's attorney could have filed a notice of insanity defense, voiced his objections to the evaluations by the court-appointed doctors or taken other measures to secure evaluations by psychiatrists or psychologists of his choice, and the fact that he found it necessary to withdraw the insanity defense after obtaining Dr. Summers' evaluation, we cannot say that manifest injustice resulted from the refusal to grant the continuance." *See id.* at 1222.

On post-conviction review, Petitioner presented a claim that Dr. Whelan operated under a conflict of interest at the time of his examination and could not produce an independent, competent examination. *See Jackson II*, 860 So.2d at 666. The court found the claim barred from post-conviction review, as Petitioner raised it under a different legal and factual theory on direct appeal. *See id.* at 666-67. It otherwise noted that the trial court granted relief on the claim that there was a conflict, so there was no resulting error. *See id.* at 667. The court found that Petitioner was not constitutionally entitled to the effective assistance of an expert witness, and that Dr. Whelan had been qualified and recognized as an expert in Mississippi courts. *See id.* It also noted that Petitioner presented the affidavit of Dr. W. Criss Lott to support his claim that Dr. Whelan did not have sufficient collateral information to assist in developing mitigating information, but that Dr. Whelan

suggested areas of possible mitigation while Dr. Lott did not.  *See id.*

Under Mississippi law, "[t]he litigation of a factual issue at trial and on direct appeal of a specific state or federal legal theory or theories shall constitute a waiver of all other state or federal legal theories which could have been raised under said factual issue; and any relief sought under this article upon said facts but upon different state or federal legal theories shall be procedurally barred absent a showing of cause and actual prejudice."  *See* Miss. Code Ann. § 99-39-21(2).  The post-conviction court relied upon this provision when it found Petitioner's claim barred, and this Court finds that this claim is barred on federal habeas review on the basis of an independent and adequate State law ground.  *See, e.g., Coleman*, 501 U.S. at 729-30.  The Court finds that Petitioner has not demonstrated cause for the default or resulting prejudice, and no relief may be granted on this claim.

The Court notes that in the absence of a bar, Petitioner's claim would not warrant relief.  *Ake* requires that an indigent criminal defendant be provided "with access to the assistance of a psychiatrist in the following two circumstances: (1) 'when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial' and (2) 'in the context of a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness.'" *White v. Johnson*, 153 F.3d 197, 200 (5th Cir. 1998) (*quoting Ake*, 470 U.S. at 83).  *Ake* requires a competent psychiatrist who will assist in the defendant's defense, but it does not require that the court appoint the "psychiatrist of his personal liking or to receive funds to hire his own." *Ake*, 470 U.S. at 83.  Here, the trial court appointed two experts to evaluate Petitioner.  Even if the Court were to assume, which it does not, that Dr. Whelan was not competent to evaluate Petitioner based upon his prior relationship with Petitioner, Dr. McKinley was competent to determine Petitioner's competency to stand trial and his criminal responsibility.  *See*

*Glass v. Blackburn*, 791 F.2d 1165, 1169 (5th Cir. 1986) (suggesting that providing defendant with more than one expert exceeds mandate in *Ake*); *see also Granviel v. Lynaugh*, 881 F.2d 185, 191 (5th Cir. 1989) (*Ake* is satisfied where court-appointed psychiatrist provides opinion and testimony to both sides). The Court notes that every expert to evaluate Petitioner, including his own, has intimated that Petitioner was sane at the time of the murders. (*See, e.g.,* Trial Tr. Vol. 7, 772-73; Trial Tr. Vol. 8, 941-45).

Additionally, the Court notes that the Fifth Circuit has held that there is no clearly established federal law granting a criminal defendant a due process right to an independent psychiatrist. *See Woodward v. Epps*, 580 F.3d 318, 331-32 (5th Cir. 2009). Petitioner has not demonstrated that there is a clearly established right to the assistance of an expert under *Ake* for the purpose of securing mitigating evidence. *See White v. Johnson*, 153 F.3d 197, 203 (5th Cir. 1998) (holding that had the state not intended to introduce testimony at trial regarding future dangerousness, defendant would have had no constitutional right under *Ake* to the appointment of a psychiatrist). Even if such a right existed, the trial court granted Petitioner permission to hire Dr. Summers and provided funds to secure his assistance at trial. Dr. Summers testified to a possibility that Petitioner was suffering from brain dysfunction associated with multiple episodes of trauma to his brain at the time these crimes occurred. (Trial Tr. Vol. 10, 1261). This claim is procedurally barred and alternatively without merit, and it shall be dismissed.

**B. Self-Incrimination/Psychotherapist-Patient Privilege**

Dr. Whelan testified at trial that in the nine months leading up to trial, he had clinical contact with Petitioner on a near daily basis. (*See* Trial Tr. Vol. 10, 1293). Petitioner argues that information that he gave to Dr. Whelan during the course of treatment was used against him in this

case without warning, without waiver of the psychotherapist-patient privilege, and without a waiver of the right against self-incrimination. Specifically, Petitioner notes that Dr. Whelan drew on his past interactions with Petitioner to conclude that Petitioner had lied about the offenses, as evidenced by Dr. Whelan's statement that "[i]t was the same story that he had asked me about on several other occasions that I had seen him." (*See* Trial Tr. Vol. 9, 1105).

On post-conviction review, the Mississippi Supreme Court determined that Petitioner's was barred from arguing that he was compelled to incriminate himself by submitting to Dr. Whelan's examination, as the claim was not raised at trial or on direct appeal. *See Jackson II*, 860 So.2d at 667. Alternatively, it found that the trial transcript demonstrates that Dr. Whelan did not rely upon his prior treatment of Petitioner in order to conclude that some of Petitioner's statements were false, and it noted that Dr. Whelan testified that his conclusions were based upon the statements of the victims and Petitioner's confession to law enforcement. *See id.*

Petitioner's claim that he did not waive his right against self-incrimination and/or the psychotherapist-patient privilege is barred from federal habeas review on the basis of an independent and adequate State law procedural ground. *See Coleman*, 501 U.S. at 729-30. Petitioner has failed to establish the requisite cause and prejudice necessary for this Court to review the claim. Additionally, Petitioner has never raised in State court a claim relating to the psychotherapist-patient privilege, and as he is now unable to do so, this claim is barred from habeas review. *See, e.g., Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) (while a claim may be deemed exhausted when there are no available remedies in state court, a petitioner must still show an exception to the procedural bar to receive federal habeas review of the defaulted claim); *see also* Miss. Code Ann. § 99-39-5(2) (statute of limitations bar) and § 99-39-27(9) (successive petition bar). In addition, the

psychotherapist-patient privilege claim is one of State law, which is not cognizable on federal

habeas review.  *See* 28 U.S.C. § 2241 (federal court is limited to deciding whether a conviction

violated the Constitution, laws, or treaties of the United States);  *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991).  Alternatively, the Court notes that it has reviewed Dr. Whelan's testimony and finds

the conclusion of the Mississippi Supreme Court factually supported by the record.  The passage of

testimony referenced by Petitioner in support of his claim that Dr. Whelan improperly drew upon

his clinical treatment of Petitioner to conclude that he was lying about aspects of the offense

occurred during the cross-examination of Dr. Whelan at the sentencing phase of trial.  (*See* Trial Tr.

Vol. 9, 1104).  After Dr. Whelan indicated that Petitioner was less than truthful in some of the things

that he told Dr. Whelan, the following exchange occurred:

> A.  He lied about the operation for him coming to the house that night.  He
> concocted a story which was an outlandish story to try and answer our questions of
> how he ended up that night at his mother's house.
> Q.  What did he tell you?
> A.  It was the same story that he has asked me about on several other
> occasions that I had seen him.  He told me that a man had - I think he was going up
> to play pinball machines in West Point and went to get a coke and bought a coke and
> some man that he didn't know put a drug in his drink and the next thing he knew he
> was in Greenwood.
> Q.  And, you say that is outlandish?
> A.  Yes, outlandish.
> Q.  Why is that?
> A.  First of all, because it doesn't match any of the facts that we know about
> the crime.  I heard his sister talk today about him coming in the house and being
> perfectly normal.  We know from the facts of the crime that he arrived and parked
> in a certain place. He, himself, said he came there because at that time he thought the
> people would be at church.  I could give countless examples but they all indicated
> that he was positively aware of what he was doing.  He was not intoxicated.

(*See id.* at 1104-05).  In his following testimony Dr. Whelan elaborated on the trial testimony and

evidence that demonstrated the purposeful nature of Petitioner's actions on the night of the crimes,

which suggested to Dr. Whelan that Petitioner was aware of what he was doing at the time of the

crimes.  (*See id.* at 1106-08).

The privilege against self-incrimination in the Fifth Amendment protects an individual's right to be free from giving compelled statements that provide the prosecution with evidence necessary to obtain a sentence of death.  *See Hoffman v. United States*, 341 U.S. 479, 486 (1951) (holding that the privilege extends to answers that would furnish a link in the chain of evidence needed to prosecute an individual).  Petitioner cites *Estelle v. Smith*, 451 U.S. 454 (1981) in support of his argument that he was forced to compromise his right against self-incrimination by submitting to an examination by Dr. Whelan.  Petitioner argues that the Fifth Circuit recognized that the right can be violated in the psychotherapist/patient context in *Gardner v. Johnson*, 247 F.3d 551 (5th Cir. 2001).  However, the Supreme Court has limited *Smith*'s holding to situations where the defendant neither initiates the examination nor attempts to introduce the evidence at trial.  *See Buchanan v. Kentucky*, 483 U.S. 402, 422-24 (1987).  In *Smith*, the examination was ordered by the trial court on its own motion, the defendant's competency and/or sanity was not put into issue at the trial, and counsel was unaware of the examination's scope, if not its very existence.  *See Smith*, 451 U.S. at 465-66, 471 n.15.  Petitioner's trial counsel was clearly aware of the examination, and counsel has since sworn an affidavit that he cautioned Petitioner about speaking to Dr. Whelan.  (*See, e.g.*, PCR Ex. 24).  Moreover, in this case, Petitioner was called in the sentencing phase by the defense, and the remarks complained of came upon cross-examination of a defense witness.  The State was entitled to cross-examine the witness or otherwise present psychiatric testimony to rebut Petitioner's allegations of brain injury.  *See Schneider v. Lynaugh*, 835 F.2d 570, 575 (5th Cir. 1988) (a defendant who puts his mental state at issue with psychological evidence may not then use the Fifth Amendment to bar the state from rebutting that evidence); *see also Buchanan*, 483 U.S. at 422-23,

425 n.21(where defendant's counsel requests the competency evaluation and offers psychiatric evidence to support a defense at trial, the prosecution may rebut the presentation with evidence from the report of the examination and the defendant has "no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution").

Although Petitioner makes no substantive argument, the Court assumes that he also raises a claim that his Sixth Amendment right to the assistance of counsel was violated by Dr. Whelan's testimony, as he cites the Sixth Amendment as a ground for relief under this claim. The Court reiterates that Petitioner has not demonstrated that Dr. Whelan relied upon any information obtained in his earlier treatment of Petitioner to make conclusions concerning Petitioner's competency and criminal responsibility, and it also notes that Walls was clearly aware of the nature and scope of the forensic examination before it occurred. *See Buchanan*, 483 U.S. at 424 (for consultation with counsel to be effective, must be based on counsel being informed about the scope and nature of the proceedings). Both Walls and Petitioner were present on the day the trial court stated it would appoint a psychologist and psychiatrist to evaluate Petitioner for competency purposes. (*See* Trial Tr. Vol. 4, 23-24; Trial Tr. Vol. 9, 1117-1118). Walls objected to the appointment of Dr. Whelan and Dr. McKinley, but he did so because he wanted his own expert. (*See, e.g.*, Trial Tr. Vol. 5, 203). Petitioner clearly had the advice of counsel before he submitted to the examination. *See Smith*, 451 U.S. at 470-71 (holding that a defendant has a Sixth Amendment right to counsel's assistance in 'making the significant decision of whether to submit to the [psychiatric] examination and to what end the psychiatrist's findings could be employed). In fact, there was testimony at trial that suggested Walls might have instructed Petitioner to be careful what he told Dr. Whelan. (Trial Tr. Vol. 10, 1297).

This claim is barred from federal habeas review, and it otherwise does not warrant federal habeas relief. This claim shall be dismissed.

## C. Trial Counsel's Failure to Secure Timely and Competent Mental Health Evaluation

Petitioner argues that if his trial counsel had secured a timely and competent mental health evaluation, he would have been able to demonstrate to the jury that Petitioner suffers from brain damage. He maintains that such an evaluation would have allowed him to show that his brain damage led to the murders for which he was convicted and sentenced to death. Specifically, he contends that Walls' failure to make a timely objection to the appointment of Drs. McKinley and Whelan and make a timely request for an independent evaluation deprived him of his opportunity to prove that a continuance should have been granted. He maintains that, as a result of these two failures, he was unable to present an expert at trial who had time to conduct a reliable mental health evaluation. In 2002, Dr. Summers conducted a full neuropsychological evaluation of Petitioner, and he concluded that if it were not for Petitioner's "deficiency in executive functioning of the frontal lobe which occurred secondary to multiple head trauma," Petitioner would not have committed the murders. (*See* PCR Ex. 25).

On post-conviction review, Petitioner argued that the court's opinion on direct appeal noted that Walls had been given five months in which to object to the chosen experts and/or secure an evaluation of an expert of his choice. *See Jackson II*, 860 So.2d at 668-69 (citing *Jackson I*, 684 So.2d at 1222). The Mississippi Supreme Court noted that Petitioner had abandoned his insanity defense at trial, and that Dr. Whelan, Dr. McKinley, and Dr. Summers all stated that Petitioner was not insane as defined by the law. *See id*. at 669. The court also found that Petitioner had been provided with a psychologist and psychiatrist in accordance with constitutional standards, and that

*Ake* specifically stated that an indigent defendant does not have a constitutional right to his choice of a psychiatrist.  *See id.* (citing *Ake*, 470 U.S. at 83).  The court found that the fact that several competent experts found that Petitioner was not insane was not a flaw in trial counsel's performance.  *Id.*  The court found that Petitioner had not shown deficient performance by counsel or resulting prejudice and rejected the claim.  *See id.*[9]

Drs. Whelan and McKinley became the court's experts on June 19,1991, and their reports were submitted on July 23, 1991.  (*See* SCP Vol. 1; PCR Supp. Ex. B, D).  The doctors were ordered to make assessments relevant to Petitioner's sanity at the time of the crimes.  (*See* SCP Vol.1, 52-53).  Walls moved to proceed ex parte on his request for funds to hire an expert of his own choosing on August 21, 1991, and he filed a notice of intent to present an insanity defense on September 5, 1991.  (*See* SCP Vol. 2, 344).  Walls admitted before jury selection began on September 9, 1991, that he filed the notice before  Dr. Summers evaluated Petitioner, and that he had yet to receive the results of Dr. Summers' evaluation.  (*See* Trial Tr. Vol. 6, 404).  At 3:15 p.m. on the afternoon of September 11, 1991, the trial court announced that Walls intended to drop the insanity defense.  (Trial Tr. Vol. 7, 773).  Walls, the next day, confirmed that he was abandoning the insanity defense based upon Dr. Summers' report.  (*See* Trial Tr. Vol. 8,  937-38).

At trial, Dr. Summers testified that there existed a high probability that Petitioner suffers from a brain dysfunction as a result of multiple head traumas, and that when events began to go outside of his plan on the night of the murders, he "snapped" and became less in control.  (*See* Trial Tr. Vol. 10, 1201-02).  In 2002, after a full battery of testing, Dr. Summers concluded that Petitioner

---

[9]  The court also noted that it had addressed the merits of Petitioner's claim that he was entitled to a continuance on direct appeal, and that the claim was procedurally barred.  *See id.*

became obsessed with money in order to satisfy mounting demands from his wife and loan companies, which resulted in the formulation of a very specific plan to steal money from his mother's safe. (*See* PCR Ex. 25). Dr. Summers opined that when things began to happen that were not in Petitioner's plan, Petitioner's limited mental flexibility prevented him from modifying his strategy in the way that someone with healthy brain functioning might. (*See id.*). He concluded that if Petitioner's brain had been capable of adapting to the rapidly changing environment he was confronted with when he arrived at his mother's home, he would not have killed his nieces and nephews. (*See id.*).

Respondents argue that Dr. Summers' 2002 report contains findings too similar to his 1991 report to support a showing of *Strickland* prejudice. They otherwise note that Dr. Summers' report also includes an opinion that Petitioner never intended to harm anyone in the home, which is inconsistent with Regina's trial testimony that Petitioner told her on the night of the murders that he had come twice to kill them and did not, but that he would kill them all that evening. (*See, e.g.*, Trial Tr. Vol.6, 567; Trial Tr. Vol. 9, 1018).

An accused is constitutionally entitled to state-provided access to a psychiatrist when his sanity is seriously in question, and when the state presents psychiatric evidence of his future dangerousness at sentencing. *See Ake*, 470 U.S. at 82-83. Even if the Court were to assume that Petitioner was entitled to expert assistance for the sentencing phase of trial, he has not shown an entitlement to an expert of his own choosing or for additional assistance where a neutral psychiatrist has been appointed. *See Woodward v. Epps*, 580 F.3d 318, 331-32 (5th Cir. 2009) (Fifth Circuit finding that there's "clearly" no "constitutional right to an 'independent' psychiatrist."). Despite the fact that Petitioner's request for an independent expert was not constitutionally mandated under *Ake*,

Petitioner was given funds and permission to hire an expert of his choice. Petitioner withdrew his insanity defense after three doctors determined that there was no basis for such a defense, and the State only introduced psychiatric evidence in rebuttal to the defense's presentation of psychiatric testimony in mitigation.

Even if the Court were to presume that trial counsel performed deficiently in failing to secure a more timely evaluation, Petitioner has failed to demonstrate that it is unreasonable to conclude that he was not prejudiced as a result. The jury heard evidence of Petitioner's head traumas and heard Dr. Summers opine that Petitioner likely had a brain injury. The jury heard the State's rebuttal expert, Dr. Charles Stanley, state that Petitioner might have a brain injury. (*See* Trial Tr. Vol. 10, 1277-78). The Court acknowledges that the opinion in Dr. Summers' 2002 report is based upon a reasonable degree of medical certainty, which is a stronger opinion than the one offered at trial. However, a "reasonable degree of medical certainty" is not so different in strength from the "high probability" of brain dysfunction that was offered at trial to raise a reasonable probability that the outcome would have been altered had this testimony been given. *See*, *e.g., Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) (prejudice is only established when omitted evidence differs substantially, in strength and subject-matter, from the evidence presented at trial); *Strickland*, 466 U.S. at 700 (prejudice inquiry requires asking whether the evidence would have significantly altered sentencing profile presented to the sentencer).

Petitioner has not demonstrated that the State court's resolution of this claim is contrary to, or involves an unreasonable application of, clearly established federal law, and this claim shall be dismissed.

**D. Competency at Trial**

Petitioner argues that the severe depression he was experiencing at the time of trial is documented, and it establishes that he was not competent to assist in his defense at the time of trial. He notes that Dr. Whelan testified that Petitioner was unable to complete certain neuropsychological testing, and that the trial court should have been alerted to the need for a competency hearing. He maintains that as the neuropsychological testing was essential to the development of mitigating circumstances in this case, he was unable to meaningfully participate in his defense by being forced to trial when he was not fully able to prepare a defense.

On post-conviction review, the Mississippi Supreme Court held the issue of whether Petitioner was too depressed to be found competent barred for Petitioner's failure to raise it either at trial or on direct appeal. *Jackson II*, 860 So.2d at 671. Alternatively, it noted that two doctors had found Petitioner competent, and that their reports were sufficient to preclude relief on the merits of the claim. *See id.*

This issue is barred from this Court's consideration pursuant to an independent and adequate State law procedural ground. *See, e.g., Coleman*, 501 U.S. at 729-30. However, as Petitioner has asserted the ineffective assistance of counsel, the Court considers whether trial counsel's performance meets the cause and prejudice standard necessary to overcome the imposition of the bar.

A criminal defendant must be competent to stand trial, which requires him to have "a rational as well as factual understanding of the proceedings against him" and (2) a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Dusky v. United States*, 362 U.S. 402 (1960). The United States Supreme Court has stated that the aim is modest and requires only that the defendant be able to understand and assist counsel. *Godinez v. Moran*, 509 U.S. 389, 402 (1993). This Court has no duty to investigate a petitioner's claim of incompetency

unless he can show that sufficient facts exist to "positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner to meaningfully participate and cooperate with counsel during trial." *Washington v. Johnson*, 90 F.3d 945, 950 (5th Cir. 1996). If a substantial doubt is raised by the presented evidence, the petitioner must prove his incompetency by a preponderance of the evidence. *Moody v. Johnson*, 139 F.3d 477, 481 (5th Cir. 1998); *Ross v. State*, 954 So.2d 968, 1007 (Miss. 2007) (noting that defendant must show incompetency by a preponderance of the evidence).

The record demonstrates that Petitioner made decisions with Walls and participated in his defense. (Trial Tr. Vol. 5, 244-252). He communicated with the court in chambers. (*See id.* at 252). He asserted his desire to be absent for portions of testimony. (*See, e.g.,* Trial Tr. Vol. 7, 656-57; 704; Trial Tr. Vol. 8, 762; 771; 834; 935). He communicated with the trial court his desire not to put on witnesses or testify, and he expressed that he understood that he was waiving those rights. (*See id.* at 947-48; Trial Tr. Vol. 10, 1262). The trial judge's report to the Mississippi Supreme Court indicated his belief that Petitioner was "[a]ble to cooperate intelligently in his own defense," and "appeared remorseful at trial, but alert. He appeared to want to get it over with." (Trial Tr. Vol. 11).

Additionally, there are reports from two qualified examiners that state that Petitioner was competent to stand trial. The record shows that Petitioner was actively engaged in decision-making with his counsel. Despite the fact that Petitioner may have been depressed at or near the time of trial, he has not contradicted the finding that he was competent at the time. *See, e.g., Bouchillon v. Collins,* 907 F.2d 589, 594 n.17 (5th Cir. 1990) ("We venture to guess that if every accused were to be adjudged incompetent who was rendered depressed or apathetic at finding himself incarcerated and indicted on felony charges, few would ever be tried."). As he has not established a reasonable probability that he was, in fact, incompetent at the time of trial, he cannot show prejudice from

33

counsel's failure to raise the issue.  *S ee Theriot v. Whitley*, 18 F.3d 311, 313-14 (5th Cir. 1994); *see also Collier v. Cockrell*, 300 F.3d 577, 587 (5th Cir. 2002).  Petitioner has not demonstrated that the rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, and it shall be dismissed.

## E.  Competency Hearing

Petitioner argues that he was denied due process by the trial court's failure to hold a competency hearing despite knowledge that (1) Petitioner had twice attempted suicide; (2) Petitioner was too depressed to complete neuropsychological testing;  (3) Petitioner was physically absent from trial on several occasions; and (4) trial counsel moved for a continuance based upon  Petitioner's absence and was denied.   Petitioner's claim is that, procedurally, he was entitled to a hearing upon a bona fide doubt as to his competency to waive his presence at trial.  *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980); *Pate v. Robinson*, 383 U.S. 375, 385 (1966).

In his cross-examination testimony during the State's case in rebuttal at the sentencing phase of trial, Dr. Whelan stated that a full battery of neuropsychological testing would have taken four hours to administer to Petitioner, and the results would have been invalid due to Petitioner's severe depression.  (Trial Tr. Vol. 10, 1296).  Petitioner maintains that the doctor implied that Petitioner's disability was apparent when he stated: "Look at him.  Think this man could sit for four hours and take a complicated psychological test[?]".  (*See id.*).  Petitioner argues that Dr. Whelan's statements, when combined with his own absences from trial, should have alerted the trial court to the need to have a competency hearing.  Alternatively, he maintains that both trial and appellate counsel were ineffective for failing to raise this issue.

The Missississippi Supreme Court held this claim barred for Petitioner's failure to raise the issue at trial or on direct appeal.  *Jackson II*, 860 So.2d at 671   Alternatively, and on the merits as

to the ineffective assistance claim, the court found that the record clarified that Petitioner competently waived his right to be present at trial, as "all of his departures resulted from trial times during which evidence or testimony was presented illustrating the damage he caused his victims." *See id.* at 671-72. The court found that the claim of ineffectiveness was without merit in light of the record of Petitioner's voluntary departures, and it denied relief on Petitioner's claims. *See id.*

Whether the trial court erred in not holding a hearing to determine Petitioner's competency to waive his right to be present at trial is a claim that is barred from this Court's consideration pursuant to an independent and adequate State law procedural ground. *See, e.g., Coleman*, 501 U.S. at 729-30. Petitioner has asserted counsel's performance as grounds to overcome the imposition of the bar, however, and the Court now considers those merits.

The question of whether the court failed its constitutional duty to hold a competency hearing is wholly separate from whether he was, in fact, incompetent. The failure of a trial court to make inquiry after the evidence raises a bona fide doubt as to a defendant's competency constitutes a denial of a fair trial. *Lokos*, 625 F.2d at 1261. The relevant question is whether the trial judge received objective evidence that "should reasonably have raised a doubt about [the] defendant's competency and alerted him to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." *Id.* The factors to be considered in resolving this issue include whether the defendant has a history of irrational behavior, his demeanor at trial, and prior opinions as to his competency. *See id.* (citing *Chenault v. Stychcombe*, 546 F.2d 1191, 1192-93 (5th Cir. 1977)).

During post-conviction proceedings, Petitioner and Walls each filed affidavits relevant to this claim. Petitioner stated that he wanted a continuance during trial, as he was too sick and depressed to fulfill his desire to be present and hear the testimony of prosecution witnesses. (*See* PCR Ex. 6,

Aff. of Henry Curtis Jackson, Jr., October 25, 2002). Walls also submitted an affidavit that stated his belief that Petitioner's depression and sickness affected Petitioner's ability to help himself, and he was concerned at the time of trial that Petitioner's jury would get a prejudicial impression from Petitioner's absence. (*See* PCR Ex. 24, Aff. of Johnnie E. Walls, Jr., October 31, 2002).

Petitioner's desire to absent himself from the courtroom during some portions of the trial was made known to the trial court prior to its first occurrence. Walls indicated to the trial court that Petitioner wished to waive his right to be present during particularly "difficult" testimony. (*See* Trial Tr. Vol. 7, 656-57). When Petitioner did leave the courtroom, it was after the trial court informed Petitioner of his right to be present and upon a waiver of that right. (*See id.* at 704-05; 772). Petitioner did request to leave due to physical illness on one occasion, and the trial court excused him after inquiring whether he wished to be examined by a doctor. (*See id.* at 772). Before allowing him to waive his presence, the trial court inquired of Petitioner whether he had eaten and whether he needed medical assistance. (*See id.*). Petitioner denied needing the assistance of a doctor and expressed his desire to waive his presence for the remainder of the day. (*See id.*). Walls' subsequent motion for a continuance based on Petitioner not being there to assist him was denied. (*Id.*).

Other than his absence due to physical illness, Petitioner was absent from the courtroom on at least three occasions. Petitioner left the courtroom when photographs of the crime scene were identified, during the testimony of the pathologist, and during the playing of the audiotape of his confession to law enforcement officials. (Trial Tr. Vol. 7, 656-57; 704; Trial Tr. Vol. 8, 762; 771; 834; 935).

Petitioner was examined by two experts prior to trial, neither of whom indicated any concerns as to Petitioner's competency, and both of whom conducted their evaluations after Petitioner's suicide attempts. (*See* PCR Supp. Ex. B, D). Petitioner was obviously aware of his right to be

present and was careful to indicate to the court that he only wished to waive his right to presence at certain portions of trial. (*See* Trial Tr. Vol. 7, 705). Counsel alerted the trial court that Petitioner did not want to be present for some of the testimony, and when it came time for testimony that was "difficult" for Petitioner, the trial court questioned Petitioner about his desire to absent himself before proceeding. The portions of trial at which he excused himself indicates that it was the horror of his own actions that drove his absence, which does not indicate an invalid waiver of his right to be present. To the contrary, it suggests that Petitioner had a full awareness of the substance and implication of the testimony to be given, as well as an ability to communicate with his attorney and the trial court.

Petitioner has failed to demonstrate ineffective assistance by counsel to overcome the bar or provide relief in this case. This case is not like *Bouchillon v. Collins*, 907 F.2d 589, 596 (5th Cir. 1990), where counsel was found ineffective for failing to seek a psychiatric evaluation or conduct an investigation despite knowledge that the defendant had previously been committed to mental institutions. Counsel attempted to secure a continuance to develop additional psychiatric evidence to be used at trial. He fully investigated an insanity defense, and it was abandoned only after no evidence was generated to support it. Moreover, Petitioner has failed to demonstrate that he was not competent to stand trial, so "it necessarily follows that {Petitioner's] trial counsel were not constitutionally ineffective" in failing to request that a competency hearing be held. *Carter v. Johnson*, 131 F.3d 452, 464 (5th Cir. 1997). Petitioner has not demonstrated that the decision of the Mississippi Supreme Court is contrary to, or involves an unreasonable application of, clearly established Supreme Court precedent, and relief on this claim is denied.

### III. Ineffective Assistance in Failing to Object to Expert Testimony on an Ultimate Issue of Law

Petitioner argues that a reasonable juror most likely considered Dr. Whelan's statement at the sentencing phase of trial that Petitioner was "responsible for what he did" on the night of the murders definitive on the issue of responsibility, thereby misleading them as to their obligation to consider mitigating evidence. (*See* Trial Tr. Vol. 9, 1111). He argues that the testimony was improper under State law and prejudicial to Petitioner, and that Walls rendered ineffective assistance of counsel in failing to object to Dr. Whelan's opinion on an ultimate issue of law.

On direct appeal, the Mississippi Supreme Court refused to consider whether the trial court erred in allowing expert testimony on an ultimate issue of law, as Petitioner did not object to the testimony at the time of trial. *See Jackson I*, 684 So.2d at 1231. On post-conviction review, the court considered whether counsel was ineffective in failing to object to Dr. Whelan's statements. *Jackson II*, 860 So.2d at 670. The court found that Dr. Whelan's statements were not a comment on the issue of responsibility, and it noted that the jury had already found Petitioner guilty at the time the comment was made. *See id.* Alternatively, the court found that Petitioner had not demonstrated deficient performance and actual prejudice as required for a *Strickland* claim. *See id.* at 670-71.

Dr. Whelan testified as a defense witness at the sentencing phase of trial. On cross-examination, the prosecutor noted that Dr. Whelan's report to the trial court indicated the presence of three factors to mitigate punishment. (*See* Trial Tr. Vol. 9, 1110-11). The prosecutor then asked:

> Q. If I am understanding your report to the Court and your testimony, [Petitioner's] actions and emotions that you found to be present had nothing to do with his responsibility is that correct?
> A. Not in a legal sense, no. Neither you nor Mr. Walls has really asked me to explain my psychological testing and why that led him to do what he did. But, in legal sense, no. He is responsible for what he did. (*Id.* at 1111).

In context, it is clear that Dr. Whelan was responding to an inquiry distinguishing between criminal responsibility and mitigating circumstances.

The erroneous admission of evidence at trial is not cognizable on federal habeas unless the admission resulted in the denial of Petitioner's right to a fundamentally fair trial. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Petitioner cites *Roundtree v. State*, 568 So.2d 1173 (Miss. 1990) for the proposition that the testimony was irrelevant to sentencing, confusing to jurors, and improper as an expert opinion on an ultimate issue of law. In that case, however, a psychiatrist's expert opinion that a capital murder defendant was insane under the *M'Naghten*[10] rule was prohibited under the court's interpretation of State evidentiary rules. *See id.* at 1180. However, Rule 1101(b)(3) of the Mississippi Rules of Evidence provides that evidentiary rules are inapplicable to sentencing proceedings. *See, e.g., Randall v. State*, 806 So.2d 185, 231-32 (Miss. 2001). Moreover, the jury's verdict of guilty established that Petitioner was responsible for his actions on the night of the murders. Therefore, counsel was not deficient in failing to object to the testimony, nor was Petitioner prejudiced as a result. Petitioner has not demonstrated that it was unreasonable to determine that he failed to make the requisite showing under *Strickland* to obtain relief on this claim, and it shall be dismissed.

### IV. Right to be Present at Trial

Petitioner argues that the trial court allowed his trial to proceed without him present on at least five occasions, and that the court failed to obtain a knowing, intelligent, and voluntary waiver from him. Petitioner argues that because he left sick and vomiting on at least one occasion, his absence could not have been voluntary. Additionally, he maintains that the trial court never informed him of

---

[10] Mississippi's test for legal insanity follows that announced in *M'Naghten's Case*, 8 Eng. Rep. 718 (1843). An insanity defense requires the accused to clearly prove that, at the time the act was committed, he or she "was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing, or (2) if he did know it, that he did not know that what he was doing was wrong." *Roundtree*, 568 So.2d at 1181.

the importance that his presence would have in the eyes of the jury. In an effort to overcome the procedural bar imposed by the Mississippi Supreme Court on this claim, Petitioner maintains that counsel was ineffective in failing to argue to the trial court that Petitioner was incapable of making a voluntary decision to leave and for not sufficiently advising Petitioner of the need to be present at trial.

On post-conviction review, the Mississippi Supreme Court held this claim barred for Petitioner's failure to raise the issue at trial or on direct appeal. *See Jackson II*, 860 So.2d at 671. Alternatively, the court found that Petitioner's absences during testimony "illustrating the damage he caused to his victims" showed that he was competent to waive his right to be present. *See id.* The court also noted that the trial court addressed Petitioner's absence prior to allowing him to leave, and the trial court stated it would instruct the jury that no negative inference should be drawn from his absence. *See id.* The court found that the record of Petitioner's voluntary departures from the courtroom prevented Petitioner from establishing deficient performance and actual prejudice on his claim of ineffective assistance. *See id.*

Petitioner's substantive claim is barred on the basis of an independent and adequate state law ground. *See, e.g., Coleman*, 501 U.S. at 729-30. However, in order to determine whether counsel's performance constitutes the requisite cause and prejudice to overcome the bar, it considers the merits of the substantive right. The right of an accused to be present at trial is rooted in the protections of both the Confrontation Clause and the Due Process Clause. *United States v. Gagnon*, 470 U.S. 522, 526 (1985). Like most other constitutional rights, the right of presence may be waived, but only if the waiver is a voluntary, "knowing, intelligent act[] done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). It may be waived by consent or misconduct, and the court is free, upon a voluntary and knowing waiver of

a defendant's right of presence, to proceed with trial. *Snyder v. Massachusetts*, 291 U.S. 97, 106 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964).

Citing *Hopt v. Utah*, 110 U.S. 574, 579 (1884) and *Diaz v. United States*, 223 U.S. 442 (1912), Petitioner argues that a capital defendant in the State's custody may not waive his right to be present during trial. However, in *Snyder v. Massachusetts*, the United States Supreme Court found the language in *Hopt* to be no more than dictum, noting that the privilege may be lost by consent or misconduct. *See Snyder*, 291 U.S. at 106, 118 n.2.; *see also Illinois v. Allen*, 397 U.S. 337, 342 (1970) ("The broad dicta in *Hopt* . . . that a trial can never continue in the defendant's absence have been expressly rejected."). Whether a capital defendant may ever waive his right to be present is a question that the United States Supreme Court reserved judgment on in *Drope v. Missouri*, 420 U.S. 162,182 (1975). Therefore, the Mississippi Supreme Court's decision is not contrary to or an unreasonable application of the clearly established waiver precedent of the United States Supreme Court.

Petitioner argues that even if the privilege of presence may be waived in a capital case, there was no valid waiver in his case. First, he maintains, the court never conducted a sufficient colloquy to ensure that his waiver was knowing and intelligent, and that he was not independently aware of the ramifications of leaving during trial. Second, he contends that he was in no condition to make a valid decision due to physical and emotional illness.

A defendant may waive his right to be present at trial if his absence is voluntary. *Taylor v. United States*, 414 U.S. 17, 19-20 (1973). The waiver of a constitutional right involves "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). A valid waiver requires a showing that the defendant knew "of the processes taking place, of his right and of his obligation to be present, and he must have no sound reason for

41

remaining away." *Taylor*, 414 U.S. at 19 n.3 (citation omitted); *see also Clark v. Scott*, 70 F.3d 386, 389-90 (5th Cir. 1995). Whether a waiver is valid is determined by the totality of the circumstances, which includes the "background, experience, and conduct of the accused." *Mann v. Scott*, 41 F.3d 968, 974 (5th Cir. 1994) (referencing *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)).

Walls asked the trial court, on the morning of September 10, 1991, whether Petitioner could leave during portions of trial testimony if he wished, as it would "be tough" for Petitioner to sit through some of the testimony to be given. (Trial Tr. Vol. 7, 656). During the testimony of Stanley Sisk, the crime scene investigator who identified the photographs made of the crime scene, Walls asked to approach the bench and informed the court that Petitioner desired to leave the courtroom. (Trial Tr. Vol. 7, 704). This occurred immediately before a videotape of the crime scene was played for the jury. (*See id.* at 706). The trial court asked Petitioner if he wished to wait outside of the courtroom, and Petitioner stated that he did. (*See id.* at 704).

> BY THE COURT: You wish to waive your right of being present during the trial?
> BY MR. WALLS: Your Honor, he wants to waive this portion of it.
> BY THE COURT: Until such time as you decide to come back in, you wish to waive your rights?
> (MR. JACKSON - Yes, sir.)
> BY THE COURT: You have every right to stay in the courtroom and be present at all times. However, on the other hand, you may wish to waive your right to any portion or all of the rest of the trial. You understand that?
> (MR. JACKSON - Yes, sir.)
> BY THE COURT: You wish to waive that right?
> (MR. JACKSON - Portions of it, yes.)
> BY THE COURT: Please take the prisoner aside. . . . Now, I wish to prepare an instruction that a defendant has the right to be present during the trial but may, at any time if he wishes to, waive that right and that he did so, and no influence of any kind was made, that he waived his right to be present, - - - don't you think so?
> BY MR. WALLS: Yes, sir. (Trial Tr. Vol. 7, 704-05).

The following day, on September 11, 1991, after the testimony of Dr. Michael Carter, a surgeon who testified to the treatment of Sarah and Regina's wounds, Walls informed the court

that Petitioner had decided to leave the courtroom. (*See* Trial Tr. Vol. 7, 762). Following the testimony of the next State witness, Walls reported that Petitioner was sick and vomiting and wished to return to the jail. (*See id.* at 771-72). The trial judge brought Petitioner into the courtroom and questioned him about his desire to leave. (*See id.* at 772).

> BY THE COURT: Mr. Jackson, Mr. Walls informs me that you want to leave the courthouse and go back to the jail, is that correct?
> A. Yes, sir.
> BY THE COURT: Do you need a doctor?
> A. No, sir.
> BY THE COURT: Have you eaten enough?
> A. I haven't eaten in awhile.
> BY THE COURT: [Y]ou can't just quit eating. You are going to have to force some food sometimes even though you don't want it. If you need a doctor, you tell them to get you one or bring you down here. And, you want to go back to the jail?
> A. Yes, sir.
> BY THE COURT: You are going to waive your right to be present?
> A. Today.
> BY THE COURT: For the rest of the day?
> A. Yes, sir.
> BY THE COURT: You may take him out. (*Id.*).

Later the same day, Walls moved for a continuance based upon the need to have Petitioner present to assist him. (*See id.* at 778-79). The trial court denied the motion, finding that Petitioner had waived his right to be present. (*See id.* at 779). The following day, Petitioner returned to court, but he informed the court that he wished to exit the courtroom during the testimony of the pathologist, Dr. Hayne. (*See* Trial Tr. Vol. 8, 834). The court questioned him and allowed him to waive his presence. (*See id.*). Petitioner returned to the courtroom after the testimony, but he again left while his taped confession was played for the jury. (*See id.* at 935). He did not ask permission from the court to leave while the audiotape was played. Rather, the judge later asked the record to reflect that he left the courtroom. (*See id.*). After the witness through whom the audiotape was introduced finished testifying, Petitioner returned to the courtroom before the next witness was

presented. (*See* Trial Tr. Vol. 9, 935).

Petitioner also argues that the trial court inexplicably ordered the bailiff to return Petitioner to jail at one point. (*See* Trial Tr. Vol. 9, 912). The record establishes that the court was speaking of Eddie Self, who had just testified, and who would not be called by the defense during its case-in-chief. (*See id.*). Once Walls informed the court that Self would not be called in the guilt phase, the trial transcript indicates that the "[d]efendant [was] taken back to the jail." (*See id.*). It is clear, however, that this is a typographical error, as Petitioner's presence is noted on the next page of the trial transcript. (*See id.* at 913).

The trial court personally questioned Petitioner each time he expressed a desire to leave and advised him of his right to be present at trial. (*See* Trial Tr. Vol. 7, 704-05; 772). The only exception to the trial court's questioning occurred when Petitioner voluntarily left the courtroom while the audiotape of his statement to law enforcement officials was being played, and the record demonstrates that Petitioner returned to the courtroom after that event and before any further evidence was presented. The record supports a determination that Petitioner voluntarily relinquished his right to be present during portions of the trial to avoid being confronted with the evidence of his crimes. The Court does note that the record clearly establishes that Petitioner was physically ill on one day of trial. On that occasion, however, Petitioner was questioned about his desire to waive his right to be present, and he denied an offer of medical treatment. Based upon the record evidence, it is not unreasonable to determine that Petitioner's physical illness was brought on by the emotional impact of the evidence presented and not a medical emergency. Moreover, the jury was instructed that Petitioner had the right to waive his presence during any part of trial, and that no inference of any kind could be drawn from Petitioner's exercise of that right. (*See* SCP Vol. 2, Instruction C.CR6).

Under the totality of the circumstances, the Court does not find it unreasonable to conclude

that Petitioner voluntarily relinquished his right to be present at trial, and Petitioner has failed to demonstrate that it was unreasonable to reject his *Strickland* claim based upon his trial absences. Petitioner has not demonstrated that he is entitled to relief on this claim, and it shall be dismissed.

## V. Biblical Argument

Petitioner asserts that the prosecutor made biblical arguments during closing argument at the sentencing phase of his capital murder trial, and that these arguments (1) urged the jurors to rely upon biblical teachings, rather than the law, in reaching their verdict; (2) amounted to an argument for an impermissible aggravating circumstance; (3) constituted a governmental endorsement of religion in violation of the First Amendment; (4) violated the requirement that a death sentence be an individualized determination; and (5) undermined the jury's responsibility in imposing a verdict. The Mississippi Supreme Court held Petitioner's claim barred on post-conviction review based on his failure to raise the issue at trial or on direct appeal. *Jackson II*, 860 So.2d at 672. The court alternatively found it without merit, noting that Walls' own religiously-based arguments permitted the government to respond in kind. *See id.* As Walls made his own religious appeal in closing argument, the court also found that Walls was not ineffective in failing to object to the response by the prosecution. *See id.*

Petitioner's claim of prosecutorial misconduct as it relates to a religiously-themed closing argument is barred on the basis of an independent and adequate State law ground. *See, e.g., Coleman*, 501 U.S. at 729-30; *Stokes*, 123 F.3d at 860. However, the Court considers whether counsel's failure to object to this argument constitutes the "cause and prejudice" sufficient to overcome the procedural bar.

At the outset, the Court notes that it is not aware of any clearly established federal law applying the endorsement test of First Amendment jurisprudence to closing argument in capital

45

sentencing proceedings, and it finds that it is not an appropriate governing standard here.  *See Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (holding that a state practice is unconstitutional if it lacks a secular purpose, has the primary effect of endorsing or inhibiting religion, or it excessively entangles government with religion).  Rather, the appropriate inquiry for a claim of prosecutorial misconduct "is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*,  477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).[11]  The trial was fundamentally unfair "if there is a reasonable probability that the verdict might have been different had the trial been properly conducted."  *Riddle v. Cockrell*, 288 F.3d 713, 720 (5th Cir. 2002).  Relevant to the determination of fairness are the "nature of the comments, the nature and the quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." *Bennett v. Angelone,* 92 F.3d 1336, 1345-46 (4th Cir. 1996).

When Walls addressed the jury in closing argument at the sentencing phase, he emphasized the evidence supporting the defense's theory that these crimes were committed because Petitioner suffers from a mental condition or defect.  Urging the jury to consider that Petitioner is obviously ill and in need of treatment, he opined that it was necessary to study such individuals in order to be able to better prevent future acts of violence.  He spoke about the forgiveness extended to Petitioner by his family, and in pleading for the jury to spare Petitioner's life, he stated:

---

[11]Petitioner maintains that the argument violated the First Amendment by governmental endorsement of a religious belief.  The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion."  This was made applicable to the states by the Due Process Clause of the Fourteenth Amendment.  *Cantwell v. Connecticut*, 310 U.S. 296, 303-04.  Petitioner has cited no binding authority for the proposition that an Establishment Clause analysis, rather than a due process analysis, guides this Court's consideration of his claim of ineffective assistance based on prosecutorial misconduct.  The Court finds it improper to do so and will not engage in an Establishment Clause analysis.

I am amazed at why we think that killing a person who killed shows that killing is wrong. . . . I am not a biblical scholar but sometimes I think we want to be God. The only time I can recall, the only time I can recall when God judged man for murder was the first murder. And, God judged Cain. And, God did not impose the death penalty. God sent him out for life but we quote all these scriptures and talk about how right we are and, then, we want to kill somebody who kills to show that killing is wrong. Curtis Jackson was wrong for what he did. Those children should not have died. They were defenseless but Curtis Jackson paid for that.

      A. (Mrs. Jackson) Yes, Lord. (From out in the audience).

      BY MRS. BRIDGES: Your Honor.

      BY THE COURT: If you can't control your emotions, I will have you evicted from the courtroom.

      MR. WALLS CONTINUING: We are here today because the State wants revenge. . . . We didn't study [condemned inmates who were put to death for horrific crimes] because we were too busy getting revenge. And, I learned growing up that revenge was mine, saith the Lord. That is what I learned. Man shouldn't take revenge because it gets him nowhere. (Trial Tr. Vol. 10, 1334-35).

Following Walls' summation, Assistant District Attorney ("ADA") Bridges was allowed to address the jury in final closing argument. Bridges began her final closing by informing the jury what she first thought about when she heard of the crimes. She stated:

[T]he first thing that came to my mind was a bible story that I had heard. The Bible story that we liked as a child and for the life of me, I can't think why we ever liked it. It was in the book, the Story of Jesus. The name of the story was the Wrath of Herod. Herod was the king. He was a jealous king. His wrath, you know about it. When he heard about the Baby Jesus, that one day he would grow up and rule Judea and, it said he decided that he must be done away with. That Herod didn't know which of the babies in Bethlehem would be this king. He decided that every children two years old and younger would be put to death. This is his law because he was the King. Every child two years old or younger was torn from his mother's arms and murdered. This terrible crime is known in history as the slaughter of the innocent because the babies were so young and they were still innocent of all the evil in the world and did not know the wickedness was the cause of their deaths. But, the mothers knew. Loud lamentation and weeping and deep mourning filled the little village of Bethlehem. Not long after King Herod had issued this terrible command and committed this horror that punished Bethlehem, that cruel monarch died afflicted with a loathsome disease. Herod died in great pain. His death was a just end in a life of brutality and wickedness. And, that is what came into my mind, ladies and gentlemen, when I heard about these four innocent babies. Counsel tells you that all of those mothers and family members forgive him. And, I think that is interesting, ladies and gentlemen, because they say they forgive him but they still think he should be punished. And, I questioned the sincerity of that forgiveness. I know what Regina told you. She couldn't forgive

everything he did. The family has some interesting explanations for why he did what he did. Andrew told you, we are all human. And, that's an excuse for killing four babies. Greggroy told you the things happen. Things happen - - he needs more tests. Let's sentence him to have some more tests. His mother told you that the devil made him do it. Ladies and gentlemen, God's law in the beginning was, if you commit a willful murder, you should be put to death. And, that really hasn't changed over the years except that now we require something else. . . . [a]nd, one of those things the legislature said justified death is the slaughter of the innocent. (Trial Tr. Vol. 10, 1341-43).

Unlike the argument in *Caldwell v. Mississippi*, 472 U.S. 320, 325, 329 (1985), where counsel told the jury that their verdict was not the "final decision" on the verdict of death, the argument in this case did not serve to undercut the jury's sense of responsibility for imposing the death penalty. Nor did the argument prevent an individualized determination of the appropriateness of a death sentence or urge an impermissible aggravating circumstance. Therefore, the Court considers whether the prosecutorial statements amounted to an argument that religious authority should control the jury's deliberations.

Prosecutorial argument that does not interject religious reference as the authority or law by which the jury is to make its decision does not run afoul of the United States Constitution. *See Coe v. Bell*, 161 F.3d 320, 351 (6th Cir. 1998) (rejecting claim that prosecutor's closing mentioning Bible amounted to reversible error); *Romine v. Head*, 253 F.3d 1349, 1368 (11th Cir. 2001) (prosecutor misleads capital sentencing jury when he quotes scripture as higher authority for proposition that death should be mandatory for anyone who murders his parents). In this case, ADA Bridges asked the jury to apply the secular law given to them, and she used a familiar reference to argue that point. The reign of King Herod and his death from a painful disease, are historical fact, and her comments concerning the slaughter of children referenced a story in a book. That the comments have a religious connotation does not render the argument inherently religious. *See Scott v. State*, 878 So.2d 933, 973 (Miss. 2004) (noting that the court has repeatedly held scriptural references proper in closing argument and noting

defendant did not address fact that State closed by telling jurors that they were to follow the instructions given by the trial court).

Moreover, Bridges' reference to "God's law" was responsive to Petitioner's own arguments. The lack of error stemming from a religious reference in closing argument has been held by the Mississippi Supreme Court to be particularly apparent where the prosecutor's comments are responsive to defense counsel's own argument. *See Hodges v. State*, 912 So.2d 730, 753 (Miss. 2005) ("The comments by the State were in rebuttal to defense counsel's own use of biblical references."); *Branch v. State*, 882 So.2d 36, 77-78 (Miss. 2004) (not error for prosecutor to make biblical references in response to defense counsel's remarks in summation).

Bridges' statements were not an endorsement of extrajudicial authority for imposing a sentence of death. Her statements were more akin to familiar Proverbs and parables that are used to support arguments outside of a religious context. The Court also notes that the jury in this case was instructed that the remarks of counsel were not evidence, and they were otherwise properly instructed as how to properly consider and weigh the evidence. Additionally, whether to object to closing argument is a strategic issue, and federal courts should be hesitant to second-guess counsel's choice. *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992). Here, defense counsel's own argument was entirely religiously loaded, so he was not deficient for failing to object to the prosecution's. Petitioner also fails to establish prejudice, as there was no prosecutorial suggestion that personal responsibility for the sentence did not ultimately rest with the jury, and the comments did not suggest that religious principles, rather than the law, applied. In sum, the argument did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden*, 477 U.S. at 181; *Donnelly*, 416 U.S. 637. Petitioner has not demonstrated that the decision of the Mississippi Supreme Court warrants relief under the AEDPA, and this claim shall be dismissed.

# VI.  Barred Claims of Prosecutorial Misconduct

Petitioner asserts several instances of prosecutorial misconduct that were found to be procedurally barred on direct appeal based upon trial counsel's failure to object at trial.  *See, e.g., Jackson I*, 684 So.2d 1213, 1226 (Miss. 1996).  He raises these claims again in federal habeas proceedings to support a substantive claim of prosecutorial misconduct, and he alternatively argues that counsel's failure to object to the statements rendered counsel's assistance ineffective.  Specifically, he maintains that the prosecutor engaged in misconduct when she (1) made an improper comment on his right to testify in violation of *Griffin v. California*, 380 U.S. 609 (1965); (2) gave an incorrect explanation of law and the nature of mitigation; (3) argued facts not in evidence and inaccurately presented facts in evidence; and (4) improperly expressed her opinion of the credibility of witnesses in violation of *United States v. Young*, 470 U.S. 1, 8 (1985).

On direct appeal, the Mississippi Supreme Court found all of Petitioner's claims barred except his claim that the prosecution alluded to his failure to testify.  *Jackson I*, 684 So.2d at 1226.  However, it determined that Petitioner had failed to demonstrate that the prosecution made any such allusions and denied relief on all of Petitioner's claims.  *See id.*  On post-conviction review, the Mississippi Supreme Court rejected Petitioner's claim that counsel was ineffective in failing to object to the prosecutor's comments.  *See Jackson II*, 860 So.2d at 673-74.  The procedural bar relied upon by the Mississippi Supreme Court precludes federal habeas review of Petitioner's substantive claims, except his claim that the prosecutor improperly commented on his failure to testify, and Petitioner must demonstrate cause and prejudice to receive federal review of the merits of the remaining claims.  *See, e.g., Coleman*, 501 U.S. at 729, 750; *see also* Miss. Code Ann. § 99-39-21(1).

The Court first considers whether the prosecutor commented on Petitioner's failure to testify, and if so, whether counsel was ineffective in failing to object.  *See Jackson II*, 860 So.2d  at 673.

Petitioner points to two portions of trial testimony to support his claim. The first instance, he maintains, came during the prosecutor's cross-examination of defense witness Gregory Jackson, Petitioner's brother. The prosecutor asked Gregory, whether he "still believe[d] that story [Petitioner] told ya'll about putting something in his drink? . . . That is what [Petitioner] told ya'll at the penitentiary, wasn't it[?]." (PCR Ex. 23, referencing Trial Tr. Vol. 9, 1151). The second comment Petitioner complains of came during ADA Bridges' closing argument. Bridges stated that Petitioner would have never been found if he had killed Sarah and Regina, and "[t]hat is what he had in mind." (PCR Ex. 23, citing Trial Tr. Vol. 10, 1345). Petitioner maintains that these comments purported to explain his thinking, thereby implicitly referring to his decision not to testify.

In *Griffin v. California*, 380 U.S. 609 (1965), the United States Supreme Court held that the Self-Incrimination Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, prohibits "comment by the prosecution on the accused's silence." *Id*. at 615. The right is violated if (1) the prosecutor's manifest intent in making the remark is to comment on the defendant's silence; or (2) the jury would naturally and necessarily construe the remark as a comment on the defendant's silence. *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996); *see also Cotton v. Cockrell*, 343 F.3d 746, 751 (5th Cir. 2003). A prosecutor does not demonstrate a manifest intent if there is another, equally plausible explanation for the remark. *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999) (quoting *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996)). The issue is whether the jury would have necessarily viewed the remark as a comment on the defendant's failure to testify, and not whether it possibly did so. *See id.*

The Court finds that neither of these comments were comments on Petitioner's failure to testify. The question to Gregory Jackson was directly in response to his statement that he would consider Petitioner's actions on the night of the crimes malicious only if he was "in his right mind"

51

when the murders were committed. (Trial Tr. Vol. 9, 1151). Bridges was questioning Gregory to determine the basis of his conviction that the crimes were not malicious, i.e., whether he believed that the crimes were not malicious because Petitioner was drugged at the time. (*See id.* at 1151-52). Bridges' statement about what Petitioner "had in mind" was an inference from the presented evidence. Evidence was presented at trial that Petitioner stated he intended to kill everyone in the house on the night of the murders, Regina testified that she pretended to be dead to avoid further attacks, and Petitioner left the home through a bathroom window. The prosecutor could permissibly argue that these facts supported a determination that Petitioner intended to kill everyone in the home to avoid detection. *See United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009) ("A prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence.").

Even if this Court were to find a *Griffin* error, it would have to determine that error had a "substantial and injurious effect or influence in determining the jury's verdict" before granting habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *Chapman v. California*, 386 U.S. 18, 22 (1967) (holding that harmless error analysis applies to *Griffin* error). Any error that might have occurred was harmless, as Petitioner's jury was instructed at both phases of trial that it could not draw any inference from Petitioner's decision not to testify or present proof. (*See* SCP Vol. 2, Instruction D-33; SCP Vol. 3., Instruction C-CR-2). Petitioner has not demonstrated that the decision of the Mississippi Supreme Court was contrary to, or involved an unreasonable application of, clearly established law. Additionally, as the prosecutor's comments were not impermissible, Petitioner has not demonstrated that he is entitled to relief under the AEDPA based upon the court's resolution of his *Strickland* claim. *See Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009) (noting that there is no deficiency or prejudice in failing to make a meritless objection).

The remainder of Petitioner's substantive claims are procedurally barred. Therefore, the Court considers whether the Mississippi Supreme Court reasonably applied *Strickland* principles to Petitioner's allegations of ineffective assistance as they concern these subclaims. The Court notes that, generally, whether to object to a closing argument is a matter of trial strategy. *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992). Petitioner has not presented the Court with evidence to suggest that it should not indulge the presumption that counsel's failure to object was strategic, and therefore, the Court does not find it unreasonable to determine Petitioner failed to demonstrate deficient performance by counsel. Therefore, the Court addresses the following subclaims only to as to *Strickland's* prejudice prong.

First, Petitioner argues that his counsel should have objected when the prosecutor misstated the law on child abuse during closing argument at the sentencing phase, as her comments suggested that the jury did not have to find that Petitioner intended to commit the underlying felony in order to convict him of capital murder.[12] In closing argument, ADA Bridges stated that "[t]he law is if you cause serious bodily injury to the child and the child dies as a result of it, then, it is capital murder." (Trial Tr. Vol. 8, 983). The Court notes that the jury was instructed at the guilt phase of trial that it was to find that Petitioner committed capital murder during the felonious abuse and/or battery of a child only if he stabbed the children "unlawfully, wilfully and feloniously." (SCP Vol. 2, Instruction S-4). The jury had already made the determination that Petitioner committed capital murder while intentionally inflicting harm upon the children. Additionally, the jury was also instructed that the arguments of counsel are not evidence. (*See* SCP Vol. 2, Instruction C-CR-1). Moreover, Petitioner cannot demonstrate a reasonable probability that the result of the sentencing would have been any

---

[12] The Mississippi Supreme Court determined that Petitioner failed to demonstrate that he was prejudiced by the argument and rejected the claim. *See Jackson II*, 860 So.2d at 673.

different if counsel had objected to the statement. Petitioner stabbed each child multiple times, and the evidence against him included the statements of two survivors and his own confession. *See Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008) (improper remarks are "sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair" which can exist when "the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.").

Second, the Court considers Petitioner's claim that trial counsel performed ineffectively in failing to object to the prosecutor's request that the jury disregard Petitioner's mitigating evidence. In closing argument, the prosecutor stated that "[t]here is nothing, ladies and gentlemen, which mitigates these crimes." (Trial Tr. Vol. 10, 1347).[13] The Mississippi Supreme Court has held that it is proper for a prosecutor to "rebut a defense argument that certain evidence should be considered as mitigating." *Evans v. State*, 725 So.2d 613, 676 (Miss. 1997). Petitioner's jury was instructed on mitigation and how to consider the evidence presented. (*See* SCP Vol. 3, Instruction S-1; Instruction S-2; Instruction D-S-3). This statement by the prosecutor did not remove the mitigating evidence from "the effective reach" of the jury, as it could not have caused the jury to reasonably believe that they could not consider the evidence offered by the defense as mitigating. *See Johnson v. Texas*, 509 U.S. 350, 368 (1993). Therefore, it did not preclude the jury's consideration of mitigating evidence in violation of *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) and its progeny.

Third, Petitioner argues that the prosecution inaccurately presented facts when ADA Bridges told jurors that Petitioner had been convicted of a kidnaping when, in fact, the charges of kidnapping

---

[13] The Mississippi Supreme Court rejected Petitioner's claim on post-conviction review, finding that he had established neither deficient performance nor prejudice as a result. *See Jackson II*, 860 So.2d at 673.

had been dropped (*See* Trial Tr. Vol. 10, 1324). He maintains she also argued facts not in evidence by stating that the victim involved in the prior kidnapping charge did not know that the gun Petitioner used in the alleged kidnapping did not work, as the victim did not testify.[14] At trial, the State introduced evidence of Petitioner's prior conviction of burglary of an inhabited dwelling armed with a deadly weapon with the intent to commit the crime of kidnapping. (*See, e.g.*, Trial Tr. Vol. 5, 205). The charge stemmed from a December 15, 1985, incident where Petitioner tried to force his ex-girlfriend from her new boyfriend's home with a gun. (*See id.* at 212-13, 215-16). Petitioner was also charged with kidnapping the victim in the case, but that charge was retired when Petitioner pled guilty to the burglary charge. (*See id.* at 206)

At the sentencing phase of trial, Ricky Banks, Sheriff of Leflore County, identified a certified copy of the indictment charging Petitioner with burglary of an occupied dwelling at night while armed with a deadly weapon. (Trial Tr. Vol. 9, 1003-04). On Walls' cross-examination, Banks stated that the incident arose when Petitioner entered a mobile home and forced his girlfriend to leave at gunpoint, though Banks stated that he believed that the gun was inoperable at the time. (*See id.* at 1005). He stated that it was his recollection that the situation occurred because Petitioner's long-time girlfriend was in the home with another man. (*Id.*). Banks testified that Petitioner was charged with burglary and kidnapping, but that Petitioner pled guilty only to burglary because the girlfriend did not want to testify against him. (*Id.* at 1006). On redirect, Banks stated that victim did not know that the gun used in the crime did not work. (*Id.* at 1009).

It is reasonable to conclude that the jury was not misled, nor was Petitioner prejudiced, by the

---

[14] The Mississippi Supreme Court rejected Petitioner's claim on post-conviction review, finding that Petitioner had failed to establish that he was prejudiced by counsel's failure to object. *See Jackson II*, 860 So.2d at 673-74.

statement regarding Petitioner's prior conviction, as a copy of the indictment and conviction went to the jury for its consideration. (Trial Tr. Vol. 9, 1002-1003). Moreover, the reference to the victim's unawareness that the gun was inoperable was an assertion in evidence at trial. *See Ables v. Scott*, 73 F.3d 591, 592 n.2 (5th Cir. 1996) (noting there is no prosecutorial misconduct where prosecutor's comments are fair comments on the evidence).

Finally, Petitioner argues that the prosecutor improperly commented on the evidence presented and expressed her personal opinion of the credibility of a witness when she stated that she "questioned the sincerity of [the witnesses' testimony of] forgiveness." (Trial Tr. Vol. 10, 1342).[15] In the passage complained of by Petitioner, the prosecutor referenced the testimony of Regina, Petitioner's sister; Andrew, stepfather to one of the murdered children; Gregory, uncle to the murdered children; and Martha, Petitioner's mother. The transcript shows that she questioned each of them at the sentencing phase about their statements that they forgave Petitioner for murdering the victims in this case. (*See* Trial Tr. Vol. 9, 1029-30; 1128-29; 1144-54; 1172). Then, in closing argument, the prosecutor stated:

> Counsel tells you that all of those mothers and family members forgive him. And, I think that is interesting, ladies and gentlemen, because they say they forgive him but they still think he should be punished. And, I questioned the sincerity of that forgiveness.

(Trial Tr. Vol. 10, 1342). It is clear that Bridges was referencing her cross-examination of these witnesses. The comment was not objectionable, and Petitioner can not demonstrate the ineffective assistance of counsel on this issue. *See Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009).

Petitioner is not entitled to relief on his claim of *Griffin* error. The remainder of Petitioner's

---

[15] The Mississippi Supreme Court found that the statement was a reference to the actual questioning of witnesses concerning their sincerity in forgiving Petitioner, and that it was not a personal opinion. *See Jackson II*, 860 So.2d at 674. The court determined counsel was not deficient, and Petitioner was not prejudiced, by the failure to object. *Id.*

substantive subclaims claims are barred, and he has failed to demonstrate that the Mississippi Supreme Court's resolution of any of the related *Strickland* claims was contrary to, or based upon an unreasonable application of, clearly established Supreme Court precedent. Therefore, this claim, and its discrete subparts, shall be dismissed.

## VII. Jury Instruction Regarding Sympathy

Petitioner maintains that the trial court instructed the jury to disregard sympathy by instructing them at the penalty phase that their "decision must not be influenced by sympathy, or by any bias or prejudice based on race, religion, color or any such matter." (Trial Tr. Vol. 10, 1319; SCP Vol. 3, Instruction C-CR-1). Petitioner argues that his right to have the jury give effect to all available mitigating evidence was impinged upon, as the trial court equated sympathy with factors like racial bias. Acknowledging that the Mississippi Supreme Court has held that a defendant has no right to "mercy" instructions, he nonetheless argues that sympathy is a proper consideration as recognized in *King v. State*, 784 So.2d 884, 889 (Miss. 2001), where the court expressed concern that an "undue emphasis of the anti-sympathy admonition" could hamper the jury's consideration of mitigating factors. He maintains that by giving the instruction, the trial court denied him of his Eighth and Fourteenth Amendment rights to a reasoned moral response to punishment. Alternatively, he maintains that trial counsel was ineffective in failing to object to the instruction and the comments made by the prosecutor and the trial court.

On direct appeal, the Mississippi Supreme Court rejected Petitioner's claims that the court erred in failing to grant "mercy" instructions. *See Jackson I*, 684 So.2d at 1239. On post-conviction review, Petitioner argued that the instruction to disregard sympathy was given by the court in error. *See Jackson II*, 860 So.2d at 674-75. The court found that it had addressed the claim, albeit in a different

context, on direct appeal and determined it was barred by res judicata. *Id.* at 674. The court further found that *King* was not an intervening decision requiring relief on the claim, as *King*'s holding was merely consistent with prior precedent holding that under the Eighth Amendment "a jury may not be instructed to disregard, in *toto*, sympathy." *Id*. at 675 (citing *Pinkney v. State*, 538 So.2d 329, 351 (Miss. 1988), *vacated and remanded on other grounds*, 494 U.S. 1075 (1990)). The court found that Petitioner's jury was not instructed to totally disregard sympathy, and that trial counsel did not perform deficiently in failing to object to the sentencing instruction. *Id.* It determined that defense counsel did not perform deficiently in failing to object to prosecutorial comments that Petitioner did not deserve sympathy, as the argument was proper rebuttal to defense counsel's argument. *Id.* Finding that Petitioner failed to demonstrate any deficiency or actual prejudice, the court rejected Petitioner's claim that counsel performed ineffectively. *Id.*[16]

The Eighth Amendment and Fourteenth Amendments require that a jury be able to consider and give effect to all relevant mitigating evidence offered by a defendant "as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). The United States Supreme Court has held that the line of cases after *Lockett* have not been construed "to mean that a jury must be able to dispense mercy on the basis of a sympathetic response to the defendant." *Johnson v. Texas*, 509 U.S. 350, 371 (1993). It has noted is a "distinction between allowing the jury to consider mitigating evidence and guiding their consideration. It is no doubt constitutionally permissible, if not constitutionally required. . . for the State to insist that 'the individualized assessment of the appropriateness of the death penalty [be]

---

[16] The court cited Miss. Code Ann. § 99-39-21(2) and (3) in finding the claim barred on post-conviction review. The Court notes that (2) of the statute states that litigating an issue on direct appeal on a specific theory waives all other theories that could have been raised under the factual issue.

a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.'" *Saffle v. Parks*, 494 U.S. 484, 492 (1990) (citation and internal citation omitted). Rather, an instruction violates the principles set forth in *Lockett* and the cases following it only upon a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).

In addition to being instructed that it was to base its decision on the evidence presented at the sentencing phase of trial, Petitioner's jury was instructed not to base its decision upon "guesswork or speculation" or by the influence of "sympathy or by any bias or prejudice. . .". (SCP Vol. 3, Instruction C-CR-1). It was instructed to apply a "reasoned moral judgment" as to the sentence to be imposed. (*See* Supp. Vol., 19). In addition to the specified mitigators the jury was instructed to consider, it was instructed to consider "any other matter. . . which you, the jury, deemed to be mitigating on behalf of the defendant." (*Id*. at 23, 27, 30, 33). Petitioner has not demonstrated that there is a reasonable likelihood that, in light of the instructions given to the jury, the jury believed it was prohibited from considering constitutionally relevant evidence. Petitioner has not demonstrated that the decision of the Mississippi Supreme Court warrants federal habeas relief on this substantive claim. Additionally, as the instruction was proper, Petitioner has not demonstrated that counsel performed ineffectively in failing to object to it, as he cannot demonstrate deficient performance or prejudice. *See, e.g., Carter v. Johnson*, 131 F.3d 452, 464 (5th Cir. 1997) (holding that it is not ineffective assistance to fail to object when the objection would be futile). This claim shall be dismissed.

## VIII.  Ineffective Assistance in Presenting Mitigating Evidence

Petitioner maintains that his trial counsel performed ineffectively in investigating and presenting evidence in mitigation of punishment, particularly as the jury was given overwhelming evidence of his guilt. Specifically, he argues that trial counsel rendered ineffective assistance when

he (1) failed to inform Dr. Whelan of Petitioner's history of head trauma; (2) failed to ensure that Petitioner was capable of completing testing related to his mental health evaluations; (3) failed to timely secure the appointment of Dr. Summers in order to present conclusive evidence of brain damage to the jury; (4) failed to present evidence that would have garnered sympathy, including Petitioner's chaotic family history and solid employment history; and (5) presented evidence that was subject to attack on cross-examination.

In addition to the affidavits from Petitioner's friends and family members that were submitted during post-conviction proceedings, Petitioner submitted the affidavits of Thomas Fortner, the Hinds County Public Defender, and Mary Therese Berthelot, a law student and licensed social worker, who interviewed Petitioner and his family members. (*See* PCR Ex. 21 and PCR Ex. 20). Fortner reviewed the record and offered his opinion that counsel performed ineffectively in this case. Fortner stated that defense counsel conducted little investigation into Petitioner's life history, and that no historical information or evidence of Petitioner's head trauma and blackouts was provided to the doctors prior to Petitioner's mental health evaluation. (PCR Ex. 21; *see also* Ex. 5, affidavit of Michael Whelman, Ph.D.).

Petitioner maintains that Berthelot's investigations revealed that Petitioner grew up in a very poor family, and that his mother, Martha, had a total of nine children with three different men. (PCR Ex. 20). Berthelot stated that her investigations revealed that Martha's relationships with these men were turbulent, with instances of alcohol abuse and domestic violence at times, and that Martha received very little financial support from any of the fathers of her children. (*See id.*). In order to provide for her family, Martha often worked more than one job, which occupied her away from the home most of the time. (*See id.*). Petitioner's grandmother cared for him while his mother was working long hours, and Berthelot notes that Petitioner's grandmother nourished him with Carnation

Instant Milk when he was an infant. (*See id.*). Berthelot also found that Petitioner had a history of head injuries, seizure-like behavior, and compulsive nail biting. (*See id.*).

When the Mississippi Supreme Court considered this evidence along with the mitigation testimony offered at Petitioner's trial, it determined that Petitioner failed "to demonstrate a reasonable probability that the result of the sentencing phase would have been different" if other mitigation witnesses had been called to give testimony. *Jackson II*, 860 So.2d at 669-70. Finding that Petitioner failed to demonstrate deficient performance and actual prejudice with respect to counsel's investigation and presentation of mitigating evidence, the court denied relief on the claim. *See id.* at 670.

This Court's inquiry is whether it was reasonable for the Mississippi Supreme Court to conclude that Petitioner failed to establish that his attorney rendered ineffective assistance. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003). Whether counsel's investigation was deficient, meaning that it fell below an objective standard of reasonableness, includes not only an assessment of the evidence known to counsel, but also whether that evidence should have prompted him to investigate further. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). The prejudice inquiry is concerned with whether, if the available but omitted mitigation testimony had actually been offered at trial, "the changes to the mitigation case would have a reasonable probability of causing a juror to change his or her mind about imposing the death penalty." *Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008). In order to assess the prejudice to Petitioner, the Court must reweigh the aggravating evidence presented against all of the mitigating evidence that was available to counsel at the time of trial. *Wiggins*, 539 U.S. at 534.

Defense counsel called seven witnesses to give testimony in mitigation of punishment in Petitioner's case. (*See* Trial Tr. Vol. 9 and Trial Tr. Vol. 10). The witnesses included Petitioner's former probation officer, a psychologist, Petitioner's brother-in-law, Petitioner's brother, Petitioner's sister, Petitioner's mother, and a psychiatrist. The testimony elicited from these witnesses included that

(1) Petitioner had turned himself in for the crimes; (2) Petitioner was extremely remorseful for the murders; (3) Petitioner was deeply depressed; (4) Petitioner had been diagnosed with Intermittent Explosive Disorder, which could have developed as a result of brain injury; (5) Petitioner had a relatively stable history prior to his arrest; (6) Petitioner's personality structure was not pervasively criminal; (7) Petitioner's family was extremely close and loving; (8) Petitioner's family had forgiven him; (9) Petitioner had multiple childhood head traumas and a history of seizures; (10) Petitioner's behavior on the night of the murders was so out of character as to indicate that something "snapped" or "came over" him at the time of the murders; (11) Petitioner had taken responsibility for the crimes; (12) Petitioner was never a normal, healthy child; and (13) Petitioner's crimes were likely caused by a complex partial seizure disorder. (*See* Trial Tr. Vol. 9, 1070-1200; 1201-1261).

Petitioner's final mitigation witness was Dr. Timothy Summers. He testified that he evaluated Petitioner and spoke with Petitioner, members of Petitioner's family, and Petitioner's former football coach as part of his assessment. (Trial Tr. Vol. 9, 1186-90). In addition, he stated that he reviewed the previous evaluations, along with the arrest report, statements in the case, and Petitioner's medical records. (*See id.*). While he agreed that Petitioner had a major depression and that it was possible that Petitioner had intermittent explosive episodes secondary to his head traumas, Dr. Summers stated that it was his opinion that Petitioner's behavior on the night of the crimes was not inconsistent with a complex partial seizure disorder. (*See id.* at 1195-96). He stated that he could not conclusively determine the diagnosis because Petitioner had not been given a comprehensive battery of neuropsychological testing, and the evaluations of Petitioner up to that point were "grossly inadequate" to make the determination. (*See id.* at 1196).

Dr. Summers testified that Petitioner's compromised brain functioning because of his multiple head traumas, his depression, his stress level from being unable to satisfactorily provide for a wife and

five children, etc., were all variables that went into understanding what happened the night of the crimes. (*See* Trial Tr. Vol. 10, 1201-02). Dr. Summers opined that Petitioner was in control of himself when he went to his mother's home, but that Petitioner "snapped" when things did not happen as he had planned. (*Id.* at 1202). His expressed his belief that there was a high probability that Petitioner's brain dysfunction caused the violent behavior. (*See id.*). He also found Petitioner's extreme remorse and his previous referral for mental health services to be diagnostically significant, as it indicated to Dr. Summers that Petitioner was not a pervasively violent criminal, but rather, that the crimes might have been prevented if Petitioner had received help when his mental illness first became apparent. (*See id.* at 1203-05).

Petitioner contends that, at the time of trial, he was unable to produce an expert opinion that he suffers from a complex partial seizure disorder that caused these murders because Walls failed to provide Dr. Whelan with relevant information, and Walls otherwise failed to timely move for and secure Dr. Summers' assistance. Dr. Lott has now concluded that Petitioner "has marked impairment in terms of executive functioning . . . seen behaviorally in terms of significant impairment in mental flexibility ability, judgment and abstract reasoning." (PCR Ex. 10). Dr. Summers has now concluded that Petitioner's "deficiency in executive functioning of the frontal lobe" led to the murders, because Petitioner is unable to display normal social functioning and proper decision making in a rapidly changing environment. (PCR Ex. 25). However, this Court notes that defense counsel requested and obtained an expert who testified that it was highly probable that Petitioner suffered from a brain injury that motivated his behavior on the night of the murders. The only real difference between the evidence presented to this Court and the evidence presented at trial is the definitiveness of the conclusion reached. (*See, e.g.*, PCR Ex. 10, 25). This is not particularly different in kind from the testimony actually presented at trial, and the evidence is insufficient to establish that Petitioner was prejudiced

by its omission. *See Strickland*, 466 U.S. at 700 (holding that a defendant is not prejudiced by omitted evidence if that evidence "would barely have altered the sentencing profile").

Moreover, the opinions offered in this case are varied. Dr. Whelan testified that Petitioner's actions were not the product of a seizure disorder. (*See* Trial Tr. Vol. 9, 1105-1112). Dr. Stanley, recognized by his peers as an expert on violent behavior, testified for the State on rebuttal that Petitioner might have a brain dysfunction, but that he did not believe that the dysfunction motivated the offense. (*See, e.g.,* Trial Tr. Vol. 1278). Both experts noted that Petitioner's clear account of the crimes and his goal-oriented behavior were indications that a brain dysfunction did not motivate the murders. (*See, e.g.*, Trial Tr. Vol. 9, 1105-09; Trial Tr. Vol. 10, 1270). Under the circumstances, it was not unreasonable to conclude that there was no reasonable probability that further evidence of Petitioner's brain functioning or injuries would have led to a different outcome.

The information contained in the additional affidavits filed in post-conviction proceedings do not offer the type of mitigating evidence that, when finally admitted, is typically found significant to sentencing. *See Wiggins*, 539 U.S. at 534-35 (noting Wiggins "experienced severe privation and abuse while in the custody of his alcoholic, absentee mother. . . . [and] physical torment, sexual molestation, and repeated rape while in foster care"); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (counsel was found deficient for failing to present available record evidence of petitioner's "nightmarish childhood," which included mistreatment, severe abuse and neglect, mental impairments, and his good behavior since being incarcerated). The omitted testimony in this case describes Petitioner's generally good, loving nature, his closeness to his family, and his history of head injuries.[17] Petitioner's jury heard

---

[17] Petitioner has presented unsigned documents from Eddie Self and Johnny Wade that purport to be affidavits. (*See* PCR Ex. 18 and 19). He also presents an affidavit from Stacy Ferraro, with the Mississippi Office of Post-Conviction Counsel, stating that the information in the unsigned documents is what she was told. (*See* PCR Ex. 26). However, as the men were

testimony that Petitioner turned himself into law enforcement authorities for these crimes and twice attempted suicide following his incarceration. Virtually every trial witness commented on Petitioner's intense remorse for his crimes. Numerous witnesses testified that violent behavior was extremely out of character for Petitioner, and a psychiatrist testified to the high probability that Petitioner suffers from a brain injury that led to his crimes. Family members, themselves victims in this case, asked the jury to spare Petitioner's life. This mitigating evidence was juxtaposed with evidence that Petitioner murdered four of his nieces and nephews, left his youngest niece for dead after using her as a shield, left his sister for dead after stabbing her numerous times and cutting her jugular vein, and inflicted numerous injuries on his eleven year old niece. The Court cannot find that Petitioner has demonstrated that the circumstances recounted in the available evidence, even if it had presented at trial, would have substantially reduced Petitioner's moral culpability for the murders. *See Williams*, 529 U.S. at 398 (court noting that available evidence might have influenced the jury's appraisal of Williams' moral culpability for the murders). Petitioner has not demonstrated that the Mississippi Supreme Court's rejection of this claim warrants relief under the AEDPA, and it shall be dismissed.

## IX. Assistance of Counsel on Direct Appeal

After the Mississippi Supreme Court affirmed Petitioner's convictions and death sentences on direct appeal, attorney Johnnie Walls requested and was granted additional time within which to file a petition for rehearing. Walls never filed the petition. When attorney C. Jackson Williams took over

---

apparently unwilling to sign the documents, they have no evidentiary value and will not be considered. Petitioner also references statements by James Hayes, Petitioner's supervisor at Bryan Foods, through the report of Dr. Lott. (*See, e.g.*, PCR Ex. 10). Lott notes that he reviewed Mr. Hayes' affidavit in writing his report, but the affidavit itself is not included as an exhibit to the State record or the filings in this Court. Therefore, the Court will not consider any information purported to have originated with Mr. Hayes.

the case, his request for permission to file an out-of-time petition for rehearing was granted. (*See* PCR Ex. 12). Although he raised three issues in the petition for rehearing, Williams states that he overlooked or failed to appreciate two issues that should have been raised in the petition. (*See id.*). First, he did not correct that Mississippi Supreme Court's erroneous belief that Dr. Whelan was not an employee of the Mississippi Department of Corrections. (*See id.*). Second, he failed to ask the court to review the claim that Petitioner appeared before the jurors in prison clothing, which was raised on direct appeal but not addressed by the court. (*See id.*). Petitioner argues that he was prejudiced by counsel's failure to raise these two issues in the petition for rehearing.

## A. Dr. Whelan's Employment

On direct appeal, Petitioner challenged the trial court's refusal to allow him to explore Dr. Whelan's affiliation with the MDOC as a denial of his right to the cross-examination of a witness. *See Jackson I*, 684 So.2d at 1231. The court found that the trial court sustained an objection to Walls' question of whether Petitioner's cooperation in the mental examination might have been limited by his attorney's instruction not to talk to anyone about the case, and particularly, with someone affiliated with the Mississippi Department of Corrections. *See id.* at 1231-32. In a footnote, the court noted that the trial court "clarified that Dr. Whelan was not employed by the Department of Corrections." *See id.* at 1231 n.4. The court found that it was only on "redirect, for the first time, did the defense broach the subject of what factors Dr. Whelan was aware of which possibly might have influenced the psychologist-patient relationship." *See id.* at 1232. Also finding the questioning irrelevant and without a proffer of what counsel intended to show by pursing the line of questioning, the court found that the trial court did not err in sustaining the objection. *See id.*

On post-conviction review, Petitioner raised the claim that attorney Williams was ineffective in failing to point out the court's factual error on direct appeal concerning Dr. Whelan's employment.

*See Jackson II*, 860 So.2d at 667. The court found that the footnote in the prior opinion was inaccurate, as Dr. Whelan was employed by MDOC, but that Petitioner failed to demonstrate deficient performance and actual prejudice in the failure to raise the issue. *See id.* at 667-68.

On federal habeas review, Petitioner argues that "[r]elevant facts must come from witnesses sworn to tell the truth and open to cross-examination," and that the Mississippi Supreme Court improperly credited the trial court's declaration as to Dr. Whelan's affiliation with the MDOC. Bolstered by an affidavit from Williams, he maintains that if the issue been raised in the petition for rehearing, the court would have granted relief on the claim that his cross-examination was improperly restricted or on his claim that the trial court's failure to grant a continuance resulted in the denial of an adequate psychiatric evaluation. (*See* PCR Ex. 12).

Dr. Whelan stated on direct examination that he maintained a private practice, and that he was employed by the Mississippi Department of Corrections at the State Penitentiary at Parchman. (*See* Trial Tr. Vol. 9, 1089). Walls questioned him about Petitioner's level of cooperation during the examination, and Dr. Whelan noted that Petitioner had "cooperated on some things and he lied on others." (*See id.* at 1084). On redirect examination, Walls asked whether Dr. Whelan was aware that attorneys sometimes tell their clients not to speak to anyone about the pending charge. (*See id.* at 1115). The State objected, and the trial court heard arguments at the bench. (*See id.* at 1115-16). Walls argued that he was entitled to show that Petitioner did not cooperate fully because he was told by his attorney not to speak to anyone, and that Dr. Whelan was employed by MDOC. (*See id.* at 1116). The court stated that Dr. Whelan was on a contract basis and was not an employee of MDOC. (*See id.* at 1116-17). After further argument, the court sustained the State's objection on the basis that the questioning was outside of the scope of cross-examination. (*See id.* at 1120).

This Court determines that the decision of the Mississippi Supreme Court on direct appeal was

not based upon its erroneous belief that Dr. Whelan was not an employee of MDOC. The inaccurate finding, therefore, is immaterial to the decision, and Petitioner has failed to demonstrate that the Court should find that he was prejudiced by it. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (holding that prejudice is established based upon appellate counsel's failure to raise non-frivolous issue where he demonstrates a reasonable probability that he would have prevailed on appeal but for counsel's deficient performance). Petitioner's claim that he might have obtained relief in his petition for rehearing if this error had been pointed out is conclusory and insufficient to warrant relief. *See Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998). Even if the issue should have been raised in the petition for rehearing, the failure to raise every single potentially meritorious claim is not ineffective assistance of counsel. *See United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 2000). Petitioner has not demonstrated that it was unreasonable to determine that Petitioner was not prejudiced by failing to raise this issue on rehearing, and relief on this claim is denied.

**B. Prison Attire**

On direct appeal, Walls claimed that the trial court erred in requiring Petitioner to appear before the jury in prison clothing, but the Mississippi Supreme Court failed to address the issue in its opinion. (*See* PCR Ex. 13). On post-conviction review, Petitioner claimed ineffective assistance of counsel based on counsel's failure to point out the court's omission in the motion for rehearing. *See Jackson II*, 860 So.2d at 667. The Mississippi Supreme Court concluded that though Williams might have had a duty to point out on rehearing that the issue was not addressed in the direct appeal opinion, Petitioner failed to demonstrate that the result of his trial would have been different had he been in other clothing. *See id.* at 668.

A review of the record shows that on the first day of trial, while at the bench outside of the hearing of the jury, Walls objected to Petitioner being brought in front of the jury in prison clothing

and being surrounded by prison guards. (Trial Tr. Vol. 6, 406). Noting that Petitioner had attempted suicide and threatened suicide numerous times, the trial court overruled the objection based on its concern that Petitioner might attempt to escape or harm himself. (*See id.* at 407). The trial judge also addressed Petitioner's attire, stating:

> [W]hile the Court is aware that the defendant is in clothes that have been furnished by the Mississippi State Penitentiary, the trousers are ordinary navy and the shirt is a blue chambray shirt worn by thousands of people on the streets. I have a son who is 22 years old and wears one just like it and there is nothing about it whatsoever to identify it in any way as being connected with the State Penitentiary or any Law Enforcement Official. The defendant advises me that he has talked with his family and they were to be here early this morning with some other clothes for him. They were so busy with the press and t.v. until they can't tend to things that they ought to have tended to. That objection is overruled. (Trial Tr. Vol. 6, 407).

After Walls asked the record to reflect that Petitioner's shirt had an insignia on it, and that the guards' camouflage clothing was no different than a uniform, the trial resumed. (*See id.* at 407-08).

The United States Supreme Court has held that a criminal defendant's right to a presumption of innocence is violated when he is compelled to appear before a jury wearing identifiable prison clothing. *See Estelle v. Williams*, 425 U.S. 501, 504, 512-13 (1976). In this case, the trial judge found nothing distinctive about the clothes worn by Petitioner, and the court did not require Petitioner to wear the clothing furnished by MDOC. (*See* Trial Tr. Vol. 6, 407-08). Therefore, the Court does not find it unreasonable to conclude that Petitioner could not have established that the result of the proceeding would have been different if this issue had not been overlooked on the petition for rehearing, and this claim shall be dismissed.

## X.  Cumulative Error

Petitioner argues that the cumulative effect of errors at trial, as well as the cumulative effect of instances of counsel's deficient performance, require that this Court grant the writ. The Mississippi Supreme Court rejected Petitioner's claim of cumulative error on direct appeal, finding several of the

claims procedurally barred and the remainder without merit. *Jackson I*, 684 So.2d at 1239. The court held Petitioner's claim of cumulative error res judicata on post-conviction review, and it otherwise determined that they were without merit. *Jackson II*, 860 So.2d at 675. A habeas petitioner seeking relief on a claim of the cumulative errors committed in the trial court must show that "(1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process." *Derden v. McNeel*, 978 F.2d 1454, 1456 (5th Cir. 1992) (citations omitted). As Petitioner has not demonstrated that any error of constitutional dimension occurred during his trial, he has not shown that it was unreasonable for the court to reject his claim. *See, e.g., Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007). Relief on this claim is denied.

## Certificate of Appealability

Under the AEDPA, Petitioner must obtain a certificate of appealability ("COA") before he can appeal this Court's decision. 28 U.S.C. § 2253(c)(1). A COA will not issue unless Petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which Petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where a petitioner's claim has been denied on procedural grounds, Petitioner must additionally demonstrate that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. This Court must issue or deny a COA upon its entry of an order adverse to Petitioner. *See* Rule 11 of the Rules Governing § 2254 Cases. The Court, resolving in Petitioner's favor any doubt as to whether a COA should issue, determines that Petitioner is entitled to a COA on his claim that he was improperly denied his right to be present at all stages of the trial. The Court determines that Petitioner has not demonstrated that reasonable jurists

would debate its procedural and/or substantive rulings on the remaining claims raised by Petitioner. Therefore, a certificate of appealability will issue only on the claim designated herein.

## Conclusion

For the reasons set forth above, Petitioner has not demonstrated that the denial of his State petition was contrary to, or involved an unreasonable application of, clearly established federal law, nor has the denial been shown to have been based on an unreasonable determination of facts in light of the evidence presented in the State court proceedings. Accordingly, it is hereby **ORDERED** that:

1. All federal habeas corpus relief requested by Petitioner is **DENIED**, and the instant petition shall be **DISMISSED** with prejudice.

2. Petitioner's request for an evidentiary hearing is **DENIED**.

3. All pending motions are **DISMISSED** as moot.

4. Petitioner is **GRANTED** a Certificate of Appealability on his claim that he was improperly denied of his right to be present at all stages of trial.

5. Petitioner is **DENIED** a Certificate of Appealability on all remaining claims raised in the petition.

6. A separate Judgment in conformity with this Opinion and Order shall issue today.

**SO ORDERED**, **THIS** the 28th day of September, 2010.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE